GEORGE D. YARON (SBN #: 96246)
gyaron@yaronlaw.com
D. DAVID STEELE (SBN #: 171636)
dsteele@yaronlaw.com
CLEVE B. COLLADO (SBN #: 297000)
ccollado@yaronlaw.com
YARON & ASSOCIATES
1300 Clay Street, Suite 800
Oakland, CA 94612
Tel:   (415) 658-2929
Fax:   (415) 658-2930

Attorneys for Defendant
DANCO BUILDERS

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>DANCO BUILDERS and DOES 1 to 10,<br><br>Defendants. | Case No.:   15-cv-03945-WHO<br><br>**MOTIONS IN LIMINE OF DANCO BUILDERS (Nos. 1-6)**<br><br>Trial Date:  June 5, 2017<br>Judge:       Hon. William H. Orrick |

Defendant Danco Builders ("Danco") hereby submits its Motions in Limine Nos. 1-6, and respectfully moves the Court for an Order precluding Plaintiff Philadelphia Indemnity Insurance Company ("Plaintiff") from referring to, or introducing evidence described in each of the 6 Motions:

1. **Motion in Limine No. 1 - Exclude All Evidence of Allegedly Negligent Construction Materials, Except for the Green Deck**

    **A.    Introduction**

    This equitable subrogation case concerns property damage from a fire on December 16, 2013, at the Willow Creek Apartments ("Apartment") in Willow Creek, California. Since filing this action on August 28, 2015, and through each of its 3 subsequent amended Complaints, Plaintiff has consistently alleged that: (1) the fire began from a discarded cigarette by a tenant on a GREEN DECK[1] and (2) the

---

[1] Danco will use the term "GREEN DECK" throughout to signify the subject deck that was installed at the Apartment where the fire originated.

fire spread because the GREEN DECK installed by Danco[1] was flammable and unsafe. (Steele Declaration, ¶¶ 2-3, Exhibit 1, Complaint, ¶¶ 9-15 and Exhibit 2, Third Amended Complaint ("3AC"), ¶¶ 23-28).

### B. Argument

On February 2, 2016, the Court issued an Order stating that it would have dismissed Plaintiff's Strict Liability claim against Danco, (Order, Dkt. 46), but before this Order was issued, Plaintiff filed its Third Amended Complaint ("3AC"), and removed its Strict Liability claim against Danco. In the 3AC, Plaintiff asserted only one count of Negligence against Danco. The 3AC, once again, identified the GREEN DECK as the culprit of the fire spread. It alleged "deck" or "DECKING" in 19 of its 41 paragraphs, but alleged no other construction component of the Apartment as a negligent cause of the fire spread. In the general allegations of the 3AC, Plaintiff alleged:

> 13. On information and belief, DANCO selected and purchased wood plastic composite decking (hereinafter referred to as [GREEN DECK]) from SCHMIDBAUER.
>
> 14. The [GREEN DECK] DANCO purchased from SCHMIDBAUER was not the DECKING Eric Roberts specified for use at WILLOW CREEK.
>
> 15. DANCO installed the [GREEN DECK] in 2006, in its original construction of WILLOW CREEK.
>
> 16. On December 16, 2013, a tenant at the WILLOW CREEK disposed of a cigarette on the balcony of apartment 524, Building F. Rather than self extinguishing, the **fire ignited the [GREEN DECK] and engulfed the second level of apartment 524, Building F, and spread to the** other portions of the building, damaging it. (Steele Declaration, ¶ 3, Exhibit 2, TAC ¶¶ 13 -16.)

In Count 1 - Negligence (Danco Builders), Plaintiff reiterated the same allegations about the GREEN DECK in 7 short paragraphs, but alleged no other unsafe construction components, as a negligent cause of the fire spread:

> 24. DANCO installed all [GREEN DECK] at WILLOW CREEK.
>
> 25. DANCO knew or should have known when purchasing and installing the [GREEN DECK] that it was composed of highly combustible materials and therefore unsafe, creating an un reasonable risk of injury and harm to WILLOW CREEK.
>
> 26. In 2006, DANCO was negligent in selecting, purchasing and installing [GREEN DECK] at WILLOW CREEK

---

[1] In 2006, Danco built the Apartment, as the general contractor.

27. On December 16, 2013, a tenant at the WILLOW CREEK disposed of a cigarette. Rather than self extinguishing, the **fire ignited the [GREEN DECK] and engulfed the second level of apartment 524, Building F, and spread to the** other portions of the building, damaging it.

28. As a proximate result of DANCO's negligence and the damage to the building as herein alleged, the insured was required to, and did, make payments for repairs to the building. (Steele Declaration, ¶ 3, Exhibit 2, TAC ¶¶ 24 - 28.)

The 3AC specifically omits any claim or reference to other components at the Apartment, such as vinyl siding, moisture barriers, Oriented Strand Board ("OSB"), soffits or draft stops, as a negligent cause of the fire. A reasonable and fair reading of the 3AC was that the GREEN DECK was at issue, nothing else.

After the pleadings were settled, Danco propounded written contention interrogatories, specifically to obtain factual evidence about Plaintiff's primary allegations of the GREEN DECK:

Please state all facts that support YOUR allegation in Paragraph 27 of the THIRD AMENDED COMPLAINT that, "On December 16, 2013 a tenant at the WILLOW CREEK disposed of a cigarette. Rather than self-extinguishing, the fire ignited the [GREEN DECK] and engulfed the second level of apartment 524, Building F, and spread to other portions of the building, damaging it." (Steele Declaration, ¶ 4, Exhibit 3, Interrogatory, No. 13.)

In Response, Plaintiff wrote:

Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further objects to the extent this Interrogatory seeks facts and information protected by Fed.R.Civ.P 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. To the extent this Interrogatory calls for information contained in the notes and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the interrogatory as premature and expressly reserves the right to supplement, clarify, revise or correct any or all responses to the interrogatory, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court. (Steele Declaration, ¶ 5, Exhibit 4, Response to Interrogatory, No. 13.)

Plaintiff never served Supplemental Responses to Danco's Interrogatories, and represented to this Court, that "we should have supplemented our discovery responses." (Plaintiff Reply Brief, November 30, 2016, 7:21 - 22, (Dkt. 75).) The pleadings and the discovery were entirely focused on the GREEN DECK, not on other construction components of the Apartment.

- 3 -
MOTIONS IN LIMINE OF DANCO BUILDERS (NOS. 1-6)
G:\4976\Trial\PhiDan -Motions in Limine.docx

After the close of discovery, Plaintiff's experts, Larry Pelton, Jeff Hughes, and Vyto Babraskaus submitted expert reports that each criticized the GREEN DECK. However, in addition, to various degrees, they each sought to criticize other construction components of the Apartment, such as the vinyl siding, moisture barriers, OSB, soffits and draft stops.

Most egregious was the Rule 26(a)(2) report of Plaintiff's construction expert, Jeff Hughes, who appeared to analyze this case as a broad construction defect case filed by the owner of the Apartment, not a limited equitable subrogation case, filed by the owner's insurance carrier to determine whether the GREEN DECK, contributed to the fire.

> The decking, siding, moisture barrier, soffit, attic draft stop did not comply with the plans, specifications or contract, where the most restrictive material is to be used in the event of an inconsistency or conflict where no RFI is administered by DANCO. (Steele Decl. ¶ 6, Exhibit 5, Hughes Supplemental Expert Report, 7:1-6.)

On January 4, 2017, this Court **denied** Plaintiff's Motion for Leave to File the 4th Amended Complaint, stating, in part,

> [Plaintiff] sought leave to file a Fourth Amended Complaint on November 9, 2016, to allege a new factual theory that Danco was negligent because it "installed or allowed second floor balcony decking, siding, moisture barrier and attic draft stops to be installed at WILLOW CREEK. Said construction was not in compliance with the plans and specifications nor good and safe building practice, and was negligent."(Citation omitted) (Order, Dkt. No. 79, 2:10 - 14.)

> Danco would be unduly prejudiced if amendment were granted. It would be required to conduct significant additional discovery of the draft stop theory, prepare new expert reports, and prepare new legal defenses. (Order, Dkt. No. 79, 6:18 - 20.)

The 3AC is and remains the operative pleading. "Each allegation must be simple, concise and direct. No technical form is required." (FRCP 8(d)(1).) A Complaint is sufficient if it gives the defendant "fair notice of what the ...claim is and the grounds upon which it rests." *(Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, 555.) It is not always necessary to specify the precise nature of the claim asserted **as long as the facts alleged put defendant on notice thereof**. *(Self Direted Placement Corp. v. Control Data Corp.* (9th Cir 1990) 908 F.2d 462, 466.) (Emphasis added.)

From the initial Complaint, through 3 subsequent amendments, Plaintiff has put Danco squarely on notice about the GREEN DECK, but it gave **no** notice that additional construction components were also alleged to be negligent causes of the fire (siding, moisture barrier, soffit, attic draft stops, etc.).

After the Court denied Plaintiff's Motion to expand the issues beyond the GREEN DECK, Danco believed that the case would be confined to the GREEN DECK. But Plaintiff disagreed, and its experts continued to testify at deposition about draft stops, moisture barriers, soffits and other components as allegedly negligent causes that contributed to the fire, requiring Danco to file this Motion.

### C. Conclusion

Plaintiff has already unsuccessfully attempted to expand the nature of this case, well beyond the discrete issue asserted in its pleadings; namely, whether Danco negligently installed a GREEN DECK, and whether such negligence contributed to the fire spread and subsequent damage. Simply stated, this case is about a GREEN DECK. There is no "Breach of Contract" claim, the owner of the Apartment did not assign any tort or contract claims to Plaintiff, and there are no allegations in the 3AC that Danco negligently used 4 or 5 other defective construction materials that, separately or jointly, exacerbated the fire damage.

As such, Danco respectfully requests that the Court exclude any evidence or argument that constructions components, other than the GREEN DECK, such as vinyl siding, moisture barrier, OSB, soffits, or attic draft stops, were negligent causes or contributing factors to the spread of the subject fire, and consequent damage.

### 2. Motion in Limine No.2 - Exclude All Evidence of Urban Wildland Interface Codes ("WUI")

#### A. Introduction

WUI is a proposed fire code, published by the International Fire Code Institute (IFCI), a not-for-profit public service corporation dedicated to public safety. (Steele Decl. ¶¶ 8 and 12, Exhibit 7, Hughes Depo., 92:4-20; Exhibit 11, Pelton 2., 69:25-71:22.)

By analogy, WUI would be similar to a model penal code, which is published and promoted by private organizations in various jurisdictions. Sometime WUI (or elements thereof) are adopted by City, County or Federal authorities, but often they are not.

Here, neither the 3AC, nor Plaintiff's Responses to Special Interrogatories, specifically allege or state that the WUI code applies to the construction of the Apartment. However, Plaintiff's three experts (Pelton, Hughes, Babrauskas), as seen below, have suggested that Danco should have followed the WUI code (or elements thereof) for this construction project, and that WUI required a higher fire-rating for any deck to be used in the construction, since the rural nature of Humboldt County carries a greater risk of wild fires.

Both sides agree that the California Building Code (CBC) was the binding authority governing this construction project. The dispute is whether WUI's higher standards apply to this case. Danco asserts that WUI was not codified into law, does not apply, confuses the issues, and did not serve as the proper standard of care for a general contractor such as Danco, when it built the Apartment.

### B. The CBC Applies to this Case as the Governing Standard, not WUI

In 2001, the State of California published the CBC. (Steele Decl. ¶ 9, Exhibit 8, Kelley Rule 26 Report, page 3.) Typically, the State of California updates and publishes the CBC every 3 years, however, it did not publish a new CBC in 2004. (*Id.*)

Danco's construction expert, Pat Kelley, has opined that the applicable standard of care of a general contractor was to comply with the CBC, and to implement and build the design of the project's architect of record. (Steele Decl. ¶¶ 9-10, Exhibit 8, Kelley Report; Exhibit 9, Kelley Depo, 18:20-19:22.)

On September 25, 2006, the Willow Creek Apartments were approved for construction by the Humboldt County Building Department. (Steele Decl. ¶ 11, Exhibit 10, Kelley Supplemental Expert Report, page 2.) Since the CBC was not updated in 2004, the CBC 2001 applied to this construction project. (*Id.*)

With respect to fire safety, Plaintiff's expert, Larry Pelton, partially agreed that the CBC governed:

| | | |
|---|---|---|
| Q: | | Okay. So as you sit here today, you do not know whether or not the [GREEN DECK] satisfied or failed to meet the California Building Code at issue – or governing at the time Willow Creek Apartments was constructed; is that true? |
| A: | | **If we're just specifically talking about the California Building Code and the Urban Interface Code for wildland safety or fire safety there, then I don't know.** |
| Q: | | We're just talking about the California Building Code. |
| A: | | **Okay** |
| Q: | | You know what the California Building Code is, right? |
| A: | | **Yes** |
| Q: | | What's the California Building Code? |
| A: | | **It's the standard that is to be met when you're building – doing construction in California.** |
| Q; | | It's the law basically, right? |
| A: | | **Yes.** |
| Q; | | All right. And, hypothetically, if the California Building Code permitted decking to be Class C at the time of the Willow Creek Apartments was constructed, then the [GREEN DECK] would have satisfied the California Building Code, correct? |
| A: | | **Correct.** (Steele Decl. ¶ 12, Exhibit 11, Pelton Dep. 2, 32:8- 24.) |

With respect to the GREEN DECK, Danco asserts that it complied with the applicable standard of care (CBC 2001) because the GREEN DECK had a Class C fire rating, which was permitted by the governing CBC 2001.

Danco's architect expert, Matthew Cardle, analyzed the applicable codes and opined that WUI was not relevant and did not apply to the subject project, because it was not adopted by the County of Humboldt or the State of California, until **after** the issuance of the building permit for the Apartment on November 2, 2006. (Steele Decl. ¶ 13, Exhibit 12, Cardle Supplemental Report, page 2.)

Plaintiff's expert, Larry Pelton, did not know whether WUI had been adopted at the time of construction of the Apartment, but did agree that it needed to be codified, before it governed a project:

| | | |
|---|---|---|
| Q: | | That's a lot of fancy language, but basically your interpretation of the WUI code is that until it's adopted by a jurisdiction's laws, it's not binding authority; isn't that true? |
| | | Objection: Calls for legal conclusion |
| A: | | **My understanding from working in a city entity, that we need to adopt the fire code before it becomes a law for our particular city, yes.** |
| Q: | | Okay. And in this particular case, the WUI was not adopted at the time the permits were issued for the Willow Creek Apartments to be built, correct? |
| A: | | **I don't know that for sure.** (Steele Decl. ¶ 12, Exhibit 11, Pelton Dep. 2, 71:7 - 20.) |

Plaintiff's construction expert, Mr. Hughes, admitted that: (1) the WUI Code was not codified for this construction project and that (2) the architect did not design the Apartment to meet the higher

standards for fire safety under the WUI code:

> Q: I understand you are you're claiming, Mr. Hughes, that the WUI standard applies, right? That is clearly in your expert report. I'm asking whether it was codified in California at the time this deck was installed at the Willow Creek apartment complex. The answer is no, correct?
> A: **The document itself, no. Period.**
> Q: What document?
> A: **The WUI code itself was not codified until 2008.**
> Q: Okay. After this Willow Creek apartment complex was built and after the green deck was installed, correct?
> A; **It would appear so from the records.** (Steele Decl. ¶ 8, Exhibit 7, Hughes Dep., 95:3 - 16.)

\* \* \*

> Q: And do you see anywhere in the design criteria in [the architectural plans that] includes WUI, W-U-I, code or specifications?
> A: **No.** (Steele Decl. ¶ 8, Exhibit 7, Hughes Dep., 37:12 -15.)

\* \* \*

> Q: The architect could have, in your opinion, designed the [Apartment] to meet this higher WUI standard that you have articulated since the [Apartment is] in this SRA and rural area, correct?
> A: **Correct.**
> Q: Okay. The architect did not, to your knowledge, do that, correct?
> A: **In some cases they did. Again, the concrete deck is indicated in the architectural and structural plans.**
> Q: In some places there are areas that, by happenstance, coincide with your version of the WUI standard; but there isn't any definitive statement anywhere, in this case, that the architect said, "Here is the WUI standard that we have to meet. We're going to use higher-rated fire materials on 25 extra things," right?
> A: **There's --- correct**
> Q; All right. For example, fire sprinklers, were those required to be on the ceiling above the green deck?
> A: **I don't know as I sit here.**
> Q: Do you know if there were fire sprinklers on the ceiling above the green deck?
> A: **I don't believe so**
> Q; You believe there were not fire sprinklers, right?
> A: **Correct** (Steele Decl. ¶ 8, Exhibit 7, Hughes Dep., 96:13 - 97: 16.)

### C. Conclusion

In short, WUI is published by a private organization that seeks to increase fire safety and protection, and, thus, has generally proposed higher standards for construction materials and practices. Danco has no objection to the mission or purpose of WUI. Some jurisdictions adopt these WUI standards, and some do not. In this case, the State of California adopted these higher fire safety standards in 2008, but not until **after** the Apartment was built. More so, the architectural plans make

specific reference to the CBC, but make no reference to the WUI standards.

As such, WUI does not apply to this case. Any suggestion or reference to it, is misleading, confusing and prejudicial to Danco, and, thus, should be excluded from this case.

### 3. Motion in Limine No. 3 - Exclude All Evidence That the Flaming Cardboard Box was more than 1-2 inches from the North Wall

#### A. Introduction

After nearly two years of investigation, the parties agree about the origin of the fire and the first two fuel sources: (1) the origin was a lit cigarette, (2) the first fuel was a paper bag containing garbage, into which the tenant negligently dumped an ashtray containing said lit cigarette, and (3) the second fuel was a cardboard box serving as a makeshift table, on which the flaming bag of garbage was situated. (Steele Decl. ¶ 12, Exhibit 11, Pelton Dep. 2, 65:10 - 66:5). This flaming concoction occurred on the GREEN DECK, of Apartment F.

Plaintiff's "origin and cause" expert, Larry Pelton, did not know whether this flaming concoction first spread to the vinyl siding of the Northwest wall or spread to the GREEN DECK.

> Q. Was there a third fuel after the cardboard box, in your opinion?
> A. **Yes.**
> Q. What was that?
> A. **The decking material.**
> Q. What's your basis for that?
> A. **Because of the large area of burning; the amount of melting to it. Eventually, the testing that was done on the plastic composite-type decking.**
> Q. Why wasn't the -- what was the siding made out of on the north wall where the cardboard box and paper bag were?
> A. **It was vinyl siding over the top of OSB strand board.**
> Q. Was there damage to the vinyl siding on Apartment F that you saw?
> A. **Yes.**
> Q. Why wasn't the vinyl siding the third fuel source?
> A. **Well, as I said before, I don't know for sure how much heating the cardboard box did. There's no way of knowing. Since the plastic was melted away in that area, <u>I don't know if that would have been the third fuel source or the fourth fuel source</u>. It was somewhere involved in that sequence close in time, probably, to the time the deck boards would have went up.**
> Q. So to be clear, you're not sure if the deck was the third fuel source. It could have been the siding, correct?
> A. **It could have been the siding. I just know that the siding is a vinyl siding, and I don't believe from the patterns on there that it burns at as high a heat rate, obviously, as the decking does. I just don't know the sequence of that. And then eventually you had OSB siding that ignited.** (Steele Decl. ¶ 7 Exhibit 6, Pelton Dep. 1, 66:10 - 67:19.)

This is important for one critical reason. Once the wall ignited, the flame spread upwards, destroying it, and then burned its way into the attic spaces, destroying those areas, as well. As seen in the Rule 26 report of Defense expert, Dr. Bernard Cuzzillo, **only a small fraction of the GREEN DECK burned (about 3.6%), while the remaining 96.4% remained structurally intact and mostly undamaged**. (Steele Decl. ¶ 16 Exhibit 15, Cuzzillo Rule 26 Report, page 4.) The small damage to the GREEN DECK was entirely localized, and was not a major source of fuel. (Steele Decl. ¶ 7 Exhibit 6, Pelton Dep. 1, 66:10 - 67:19.) This small amount of damage to the GREEN DECK is remarkable given that the tenant in Apartment F failed to report the fire, causing it to burn for an astounding 12-17 minutes, until a driver on a nearby highway, 400 yards away, saw the flames, and called the Volunteer Fire Department. (Steele Decl. ¶ 12 Exhibit 11, Pelton Dep. 2, 76:9-78:6.)

An important question is how close was the flaming cardboard box to the wall? The farther the flaming cardboard box was from the burning wall, the more persuasive Plaintiff's argument that the GREEN DECK played a role in the spread of the fire. The closer the flaming cardboard box was to the burning wall, the less persuasive. Expert Pelton could not determine whether the flaming cardboard box simply ignited the wall directly, or first ignited the GREEN DECK. (Steele Decl. ¶ 7 Exhibit 6, Pelton 1, 66:10 - 67:19.)

### B. Argument

In response to a Notice of Deposition of Plaintiff's Person Most Knowledgeable, Plaintiff produced Larry Pelton for deposition on August 19, 2016. This was before Expert Reports were exchanged on September 27, 2016.

> Q: Do you understand that you're being produced as a Rule 30(b)(6) witness for the plaintiff, Philadelphia Indemnity Insurance Company?
> A: **Yes, I do.** (Steele Decl. ¶ 7 Exhibit 6, Pelton Dep. 1, 5:23 - 6:1)

\* \* \*

Mr. Pelton was asked whether he produced documents for the deposition, whereupon counsel for Plaintiff objected, but made the following representation:

> Objection. We had discussed previously the purpose of Mr. Pelton's deposition. He's not being proffered as a 30(b)(6) witness in each of the categories; **solely in the origin, cause and spread of the fire.** (Steele Decl. ¶ 7 Exhibit 6, Pelton Dep. 1, 6:7-11.)

Mr. Pelton then went on to describe his investigation of the fire, 2 weeks after it happened, and described how the fire spread:

> Q. When you say the vinyl -- I'm sorry -- "The box was up against the vinyl siding," are you saying -- you are saying that the cardboard box, the second source of fuel **was adjacent to that north wall on the deck**, correct?
> A. **That's correct. Adjacent to it. I don't know if it was touching, but I believe it was within an inch or two.**
> Q. Fair enough. You say that you usually get approximately 30 percent more heat release towards the ceiling, and what do you mean by that?
> A. **If a fire is burning against a wall or in a corner versus in the center of a room, the heat is going to -- instead of -- if it was in, say, the middle of the deck, the heat is going to be dissipated on all sides, okay? If it's up against something that's blocking it, the heat is going to hit that and then rise up quicker than it would if it had dissipated out.**
> Q. And in this case, the 30 percent increase in heat release was directly towards the, what we've called the northwest wall, which had vinyl siding on the exterior, correct?
> A. **Yes.**
> Q. All right. And what was the consequence of that approximately 30 percent increase in heat release towards the vinyl siding?
> A. **Just gets the heat to the vinyl soffit quicker than it would have if the fire had been in the middle of the deck.** (Steele Decl. ¶ 12, Exhibit 11, Pelton, Dep. 2, 17:2 - 18:5.)

Mr. Pelton's testimony, as Plaintiff's 30(b)(6) witness regarding the "origin, cause, and spread of the fire," makes clear that the flaming cardboard box was either adjacent to or within 1 or 2 inches of the wall. At his later deposition on January 9, 2017, as Plaintiff's expert in the very same issues, Mr. Pelton re-affirmed his prior testimony:

> Q. When you say the vinyl – I'm sorry - "The box was up against the vinyl siding," are you saying – you are saying that the cardboard box, the second source fuel was adjacent to that north wall on the deck, correct?
> A. **That's correct. Adjacent to it, I don't know if it was touching, but I believe it was within an inch or two.** (Steele Decl. ¶ 12 Exhibit 11, Pelton Dep. 2, 17:2-9.)

However, Plaintiff designated another fire expert, Dr. Vyto Babrauskas, who tried to increase this distance to 12 inches between the flaming cardboard box and wall that burned. (Steele Decl. ¶ 14, Exhibit 13, Babrauskas Dep., 40:3-17.)

Plaintiff's two experts contradict each other on the important question of how close the flaming cardboard box was to the wall that burned. However, Pelton was also serving as a Rule 30(b)(6) witness on behalf of a corporate Plaintiff, and thus his testimony is potentially binding, as a party

- 11 -
MOTIONS IN LIMINE OF DANCO BUILDERS (NOS. 1-6)
G:\4976\Trial\PhiDan -Motions in Limine.docx

admission. (See, e.g., *A&E Prods. Grp., L.P. v. Mainetti USA, Inc.*, No. 01-10820, 2004 U.S. Dist. LEXIS 2904, at *19 (S.D.N.Y. Feb. 25, 2004); *Resolution Trust Corp. v. Farmer*, No. 92-3310, 1994 U.S. Dist. LEXIS 8755, at *5 (E.D. Pa. June 23, 1994) ["The purpose behind Rule 30(b)(6) is to create testimony that will bind the corporation."] (citations omitted).)

Indeed, some courts refuse to allow the introduction of contrary evidence at trial. (See, e.g., *Ierardi v. Lorillard, Inc.*, No. 90-7049, 1991 U.S. Dist. LEXIS 11887, at *8 (E.D. Pa. Aug. 20, 1991). ("If the designee testifies that [the agency] does not know the answer to [the opposing party's] questions, [the agency] will not be allowed effectively to change its answer by introducing evidence during trial."); *Great Am. Ins. Co. v. Summit Exterior Works, LLC.*, No. 3:10-cv-1669, 2012 U.S. Dist. LEXIS 17548, at *16–18 (D. Conn. Feb. 13, 2012); *QBE Ins. Corp. v. Jorda Enters.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012).) These courts reason that treating the statements in a Rule 30(b)(6) deposition as admissions is most consistent with the purpose of the rule, which is to "permit[ ] the examining party to discover the corporation's position via a witness designated by the corporation to testify on its behalf." (*Kawasaki*, 291 F.R.D. at 303 [quoting *Rosenruist-Gestao E. Servicos LDA*, 511 F.3d at 440 n.2].)

Danco does concede that federal jurisdictions are split on the issue of whether deposition testimony of a Rule 30(b)(6) witness is binding. "According to the Seventh Circuit, a corporation is not absolutely bound to its designee's CR 30(b)(6) testimony." (*A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001).) "Such testimony is the statement of the corporate person, which if altered, may be explained and then explored through cross-examination as to why it was altered." (*United States v. Taylor*, 166 F.R.D. 356, 362 n.6 (M.D.N.C. 1996).)

Danco did not find any cases in the Ninth Circuit establishing whether or not Rule 30(b)(6) testimonies are binding on a corporation. However, it is critical to note that Mr. Pelton served in two capacities: 1) as the corporate representative, and 2) as the expert. The fact that Plaintiff added a new and different expert to try to expand the distance between the flaming cardboard box and the inflamed wall does not alter Pelton's testimony.

### C. Conclusion

Here, Mr. Pelton, who actually visited the scene of the fire, confirmed that the box was adjacent to or 1 to 2 inches from the wall; Plaintiff's additional duplicative expert, Dr. Babrauskas tried to countermand this by claiming the box was 12 inches from the wall. The Court should exclude the opinion of Dr. Babrauskas on this issue of distance, since it conflicts with the prior admission of Plaintiff's Rule 30(b)(6) witness, as "origin, cause, and spread expert."

### 4. Motion in Limine No. 4 - Exclude All Expert Testimony of Dr. Vyto Babrauskas Regarding the Spread of the Fire, as Duplicative of Larry Pelton's Testimony

### A. Introduction

Plaintiff designated Larry Pelton as its FRCP Rule 30(b)(6) witness, and as the fire expert to discuss the origin, cause and spread of the fire. (Steele Decl. ¶ 7, Exhibit 6, Pelton Dep. 1, 6:7-11.)

In his Rule 26(a)(2) Report and at deposition, Mr. Pelton gave his opinion on all 3 aspects of the fire, its origin, cause and spread:

> Q:  As you sit here right now, you don't know if the Ultra Guard vinyl deck that was specified in the plans has a Class A or Class B or a Class C classification for flame spread, correct?
> A:  **I don't recall what the flame spread is. I don't believe I've seen some documentation on it. I don't recall what it is right now.**
> Q:  So my question is correct, then?
> A;  **As I said here today, I don't remember what the flame spread would be on it.**
> Q;  So you don't have an opinion as to whether or not the green deck that was actually installed at Willow Creek has a better or worse classification than the Ultra Guard deck that was specified in the plant; is that correct?
> A:  **Alls I recall is at the green decking material is- how do you say? – -I was going to say worse in the flame spread than the Ultra Guard. I don't – like I'm trying to say, I don't remember what the Ultra Guard is. I just know that Ultra Guard was a better product than the green deck board.**
> Q:  Is that written in your report anywhere, Exhibit 5, that Ultra Guard was a, quote, better product in the green deck?
> A:  **No, because that wasn't my - my goal of the time is to write the report of what caused the fire and what contributed to the spread. Not what products should've been used.** (Steele Decl. ¶ 12, Exhibit 11, Pelton Dep. 2, 35:20 - 36: 18.)
>
> \*   \*   \*
>
> Q:  Okay. In your opinion, if Danco had used the light concrete deck as opposed to the [GREEN DECK], would that have changed the fire spread and the fire damage at the [Apartment]?
> A:  **Yes.**
> Q:  How so?
> A:  **The – obviously the decking material would not have contributed to the fire intensity and spread. It would have – the cardboard box, I**

- 13 -

> believe, eventually would have ignited the siding and then the craft paper construction paper underneath, and then the OSB underneath that, and spread up the wall into the attic through the vinyl soffit and then into the attic area. (Steele Decl. ¶ 12, Exhibit 11, Pelton Dep. 2, 37:23 - 38: 10.)
>
> \* \* \*
>
> Q: The bottom line is you cannot quantify a time difference had a light concrete deck been used as opposed to the [GREEN DECK], correct?
> A: **Not a time period besides much slower progression.** (Steele Decl. ¶ 12, Exhibit 11, Pelton Dep. 2, 39:7-11.)

### B. Dr. Babrauskas's Opinion Testimony is Partially Duplicative of Mr. Pelton's, and Should be Excluded

Undeniably, Mr. Pelton was retained to give expert testimony about the origin and cause of the fire, and also the "spread" of the fire. As noted in his deposition testimony above, he rendered such opinions.

Dr. Babrauskas explained that his assignment as to "answer various fire science-type questions as to the behavior of materials of construction practices that are appropriate in high hazard zones and related issues that have to do with fire safety issues." (Steele Decl. ¶ 14, Exhibit 13, Babrauskas Depo. 14: 2- 7.). When asked if he did a determination of the origin and cause of the fire in this case, Dr. Babrauskas said "No." (Steele Decl. ¶ 14, Exhibit 13, Babrauskas Depo. 14: 8- 22.)

However, in several respects, at his deposition, Dr. Babrauskas offered his opinion as to the "spread" of the fire, as to the vinyl siding, moisture barrier, OSB, soffits and attic spaces. (Steele Decl. ¶ 14, Exhibit 13, Babrauskas Depo. 14: 8- 22.)

A trial court has considerable power to exclude evidence that is merely cumulative, including limiting the number of witnesses each party may call. (*Boersma v. Amoco Oil Co.*, 276 Ill. App. 3d 638, 648 (1st Dist. 1995).) This prohibition against allowing multiple duplicative witnesses from testifying has been applied to both fact witnesses and expert witnesses. (See, e.g., *Knight v. Haydary*, 223 Ill. App. 3d 564, 577 (2d Dist. 1992) [holding that trial court may bar an expert from testifying where the expert's testimony would be cumulative]; *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 771 N.E.2d 357 (2002).)

It is within the power of the court to exclude testimony that is repetitious and cumulative of testimony already offered at trial. (*Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1315 (11th Cir. 2005) [noting that part of trial court's broad authority over trial management is the power to exclude

cumulative testimony]; *Laurent v. Ashcroft*, 359 F.3d 59, 63 (1st Cir. 2004) [noting that "[c]ommon sense suggests that trial judges must be accorded considerable leeway in cutting off cumulative or redundant testimony, and the case law so holds."]; *Leefe v. Air Logistics, Inc.*, 876 F.2d 409, 411 (5th Cir. 1989) ["It is within the power of the district court to exclude testimony that is repetitious and cumulative of testimony already before the court."]; *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir.) ["It is well established that testimony which is merely repetitious and cumulative of testimony already introduced may be excluded by the trial court in its discretion."], cert. denied, 471 U.S. 1126 (1985); Fed. R. Evid. 403.)

### C. Conclusion

Larry Pelton is the "origin, cause, and spread" expert of Plaintiff. Any testimony offered by Dr Babrauskas, which delves into the spread of the fire, should be excluded as cumulative.

### 5. Motion in Limine No. 5 - Exclude All Evidence that Ultra Guard Vinyl Deck Had a Better Fire Rating than the GREEN DECK

#### A. Introduction

The architectural plans called for an Ultra Guard deck, made out of PVC. However, the GREEN DECK was installed. A central issue is whether the Ultra Guard deck would have performed in better or worse, than the GREEN DECK did in the fire. Plaintiff has presented no evidence on this question, and its 3 experts did not evaluate this comparison. Plaintiff's construction expert, Jeff Hughes, testified as follows:

> Q: At the time that [the Apartment] was being constructed, the California Building Code permitted a deck to have a Class C classification, correct?
> A: **I would have to look at the code to see that.**
> Q: You don't know one way or the other as you sit here?
> A: **I'd have to look at the code.**
> Q: That's fine. But please answer my question. As you sit here without looking at the code, you don't know one way or the other whether the Class C classification for a deck satisfied the California Building Code at the time that this [Apartment] was built, correct?
> A: **As I sit here right now without looking at the code, I don't recall.**
> (Steele Decl. ¶ 8, Exhibit 7, Hughes Depo. 81:21 - 82:11.)
> \* \* \*
> Q: All right. And you don't know whether the [GREEN DECK] has a similar classification for flame spread as the Ultra Guard vinyl deck noted in the plans, correct?

A: **As I sit here, I don't.** (Steele Decl. ¶ 8, Exhibit 7, Hughes Depo. 82: 19 - 23.)

Plaintiff's expert, Larry Pelton, did not know the flammability of the vinyl deck.

Q: As you sit here right now, you don't know if the Ultra Guard vinyl deck that was specified in the plans has a Class A or Class B or a Class C classification for flame spread, correct?
A: **I don't recall what the flame spread is. I don't believe I've seen some documentation on it. I don't recall what it is right now.**
Q: So my question is correct, then?
A; **As I said here today, I don't remember what the flame spread would be on it.** (Steele Decl. 12, Exhibit 11, Pelton Dep. 2, 35:20-36:4.)

Plaintiff's materials expert, Dr. Vyto Babrauskas, prepared an expert report under Rule 26(a)(2), and discussed the Ultra Guard deck, noted in the architectural plans, but made no comparative evaluation as to whether it had a better or worse flame spread index as the GREEN DECK. (Steele Decl. ¶ 15, Exhibit 14, Babrauskas Expert Report, page 2, section 2.)

### B. Conclusion

The GREEN DECK installed at the Apartment had a flame spread index of 150, which meant that it satisfied the then-existing CBC. None of Plaintiff's experts did a comparative analysis between the GREEN DECK and the Ultra Guard deck, described in the plans.

The Court should exclude Plaintiff from offering any evidence that the Ultra Guard deck would have performed better in the fire, had it been installed rather than the GREEN DECK.

### 6. Motion in Limine No. 6 - Limit Plaintiff's Factual Evidence to its Responses to Special Interrogatories

### A. Introduction

After the pleadings were settled, Danco propounded written contention interrogatories, specifically to obtain factual evidence about Plaintiff's primary allegations of the GREEN DECK:

Please state all facts that support YOUR allegation in Paragraph 27 of the THIRD AMENDED COMPLAINT that, "On December 16, 2013 a tenant at the WILLOW CREEK disposed of a cigarette. Rather than self-extinguishing, the fire ignited the [GREEN DECK] and engulfed the second level of apartment 524, Building F, and spread to other portions of the building, damaging it." (Steele Declaration, ¶ 4, Exhibit 3, Interrogatory, No. 13.)

In Response, Plaintiff wrote:

> Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further objects to the extent this Interrogatory seeks facts and information protected by Fed.R.Civ.P 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. To the extent this Interrogatory calls for information contained in the notes and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the interrogatory as premature and expressly reserves the right to supplement, clarify, revise or correct any or all responses to the interrogatory, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court. (Steele Declaration, ¶ 5, Exhibit 4, Response to Interrogatory, No. 13.)

Plaintiff never served Supplemental Responses to Danco's Interrogatories, and represented to this Court, that "we should have supplemented our discovery responses." (Plaintiff Reply Brief, November 30, 2016, 7:21 - 22, (Dkt. 75.)

Under FRCP Rule 33, "Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath."

The duty to supplement discovery responses is ongoing, and failure to supplement responses adequately can result in the exclusion of the untimely disclosed information. The required Rule 26(e) supplementation "should be made at appropriate intervals during the discovery period." (Fed. R. Civ. P. 26(e) advisory committee's note to 1993 amendments.) It is the responsibility of the party in possession of the information to supplement its responses, whether or not the opposing party seeks additional disclosure. A "party may not free itself of the burden to fully comply" with the obligation to supplement by placing "a heretofore unrecognized duty of repeated requests for information on its adversary." (*Arthur v. Atkinson Freight Lines Corp.*, 164 F.R.D. 19, 20 (S.D.N.Y. 1995) [discussing duty to supplement under Rule 26(e)].)

The duty to supplement applies whether the corrective information is learned by the client or the attorney, and extends not only to newly discovered evidence, but also to information that was not originally provided even though it was available at the time of the initial disclosure or response. (*Am. Friends of Yeshivat Ohr Yerushalayim, Inc. v. United States*, 2009 WL 1617773, at *5 (E.D.N.Y. June 9, 2009).) In addition, the duty to supplement continues even after the discovery period has closed. (See, e.g., *McKinney v. Connecticut*, 2011 WL 166199, at *2 (D. Conn., Jan. 19, 2011) [noting that the

"fact that discovery has closed has no bearing on [the d]efendant's duty to supplement under Rule 26(e)"].)

FRCP Rule 37(c) enforces the disclosure requirements imparted by Rule 26. Rule 37(c) states, in relevant part:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P 37(c)(1); see also *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008) (affirming district court's order excluding undisclosed damages evidence); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001);

### B. Conclusion

Plaintiff provided virtually no information in its responses to Interrogatories, and never provided supplemental responses. The TAC solely alleged the GREEN DECK as the chief issue in the case, while responses to Interrogatories propounded to explore the factual support of the claim, were not forthcoming. Danco suggests that the failure to offer facts in the responses to Interrogatories is what led Plaintiff's experts to try to expand the negligence claim in several, sprawling directions.

Plaintiff's evidence should be confined to its evidence contained in its Interrogatory Responses.

DATED: April 13, 2017

YARON & ASSOCIATES

By _____
GEORGE D. YARON
D. DAVID STEELE
CLEVE B. COLLADO
Attorneys for Defendant
DANCO BUILDERS

# PROOF OF SERVICE

I am over 18 years of age and not a party to the within action. I am employed in the County of Alameda; my business address is Yaron & Associates, 1300 Clay Street, Suite 800, Oakland, California, 94612.

On **April 14, 2017,** I served the within:

**MOTIONS IN LIMINE OF DANCO BUILDERS (Nos. 1-6)**

as addressed below, by causing a true copy thereof to be distributed as follows:

| Stephen N. Cole, Esq.<br>THE COLE LAW FIRM<br>3410 Industrial Blvd., Suite 100<br>West Sacramento, CA 95691<br>Tel: (916) 376-0486<br>Fax: (916) 376-0478<br>scole@colenetlaw.com | Thomas G. Beatty, Esq.<br>MCNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP<br>1211 Newell Avenue<br>Walnut Creek, CA 94596-5238<br>Tel: (925) 939-5330<br>Fax: (925) 939-0203<br>thomas.beatty@mcnamaralaw.com |
|---|---|

( )  **VIA U.S. MAIL:** I am "readily familiar" with the firms practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

( )  **VIA HAND-DELIVERY:** I caused such envelope, to be hand delivered to the stated parties.

( )  **VIA FAX:** I caused such documents to be transmitted via fax to the stated parties at their respective facsimile numbers.

( )  **VIA EXPRESS CARRIER:** I caused such documents to be collected by an agent from to be delivered to the offices of the stated parties.

( X )  **VIA E-MAIL:** Pursuant to agreement, I caused such document to be sent via email to the offices of the addressees so designated.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on **April 14, 2017**, at Oakland, California

_____
Kelly Forst