GEORGE D. YARON (SBN #: 96246)
gyaron@yaronlaw.com
D. DAVID STEELE (SBN #: 171636)
dsteele@yaronlaw.com
CLEVE B. COLLADO (SBN #: 297000)
ccollado@yaronlaw.com
YARON & ASSOCIATES
1300 Clay Street, Suite 800
Oakland, CA 94612
Tel:    (415) 658-2929
Fax:   (415) 658-2930

Attorneys for Defendant
DANCO BUILDERS

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY,<br><br>            Plaintiff,<br><br>vs.<br><br>DANCO BUILDERS and DOES 1 to 10,<br><br>            Defendants. | Case No.:    15-cv-03945-WHO<br><br>**DECLARATION OF D. DAVID STEELE IN SUPPORT OF DEFENDANT DANCO BUILDERS' MOTIONS IN LIMINE (Nos. 1-6)**<br><br>Trial Date:   June 5, 2017<br>Judge:        Hon. William H. Orrick |

I, D. David Steele, declare:

1.      I am an attorney duly licensed to practice in all courts of the State of California, and in the United States District Court, Northern District of California. I am a partner with the law firm of Yaron & Associates attorneys of record for defendant Danco Builders (hereafter "Danco").   I have personal knowledge of the information set forth herein, all of which is true and correct of my own personal knowledge, and if called upon to testify, I could and would competently testify thereto.

2.      Attached as Exhibit 1 is a true and correct copy of the Complaint, filed on August 28, 2015.

3.      Attached as Exhibit 2 is a true and correct copy of the Third Amended Complaint, filed on February 2, 2016.

4.      Attached as Exhibit 3 is a true and correct copy of Danco's Special Interrogatories, served on Plaintiff on March 30, 2016.

- 1 -

5.      Attached as Exhibit 4 is a true and correct copy of Plaintiff's Responses to Danco's Special Interrogatories, served on Danco on April 29, 2016.

6.      Attached as Exhibit 5 is a true and correct copy of excerpts of Jeff Hughes' Supplemental Rule 26 Report, dated October 27, 2016.

7.      Attached as Exhibit 6 is a true and correct copy of excerpts of Larry Pelton's deposition transcript, taken on August 19, 2016, ("Pelton Dep. 1").

8.      Attached as Exhibit 7 is a true and correct copy of excerpts of Jeff Hughes' deposition transcript, taken on January 10, 2017.

9.      Attached as Exhibit 8 is a true and correct copy of excerpts of Patrick Kelley's Rule 26 Report, dated September 22, 2016.

10.     Attached as Exhibit 9 is a true and correct copy of excerpts of Patrick Kelley's deposition transcript, taken on January 11, 2017.

11.     Attached as Exhibit 10 is a true and correct copy of excerpts of Patrick Kelley's Supplemental Rule 26 Report, dated October 20, 2016.

12.     Attached as Exhibit 11 is a true and correct copy of excerpts of Larry Pelton's, deposition transcript, taken on January 9, 2017, ("Pelton Dep. 2").

13.     Attached as Exhibit 12 is a true and correct copy of excerpts of Matthew Cardle's Supplemental Rule 26 report, dated October 10, 2016.

14.     Attached as Exhibit 13 is a true and correct copy of excerpts of Vytenis Babrauskas' deposition transcript, taken on January 3, 2017.

15.     Attached as Exhibit 14 is a true and correct copy of excerpts of Vytenis Babrauskas' Rule 26 report, dated October 21, 2016.

16.     Attached as Exhibit 15 is a true and correct copy of excerpts of Dr. Bernard Cuzzillo's Rule 26 report, dated September 21, 2016.

- 2 -

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct, and this declaration was executed on April 13, 2017.

3

4                                                    D. David Steele

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF D. DAVID STEELE IN SUPPORT OF DEFENDANT DANCO BUILDERS' MOTIONS IN
LIMINE (NOS. 1-6)
G:\4976\Trial\PhiDan - DDS Decl ISO Motions in Limine.docx

# EXHIBIT 1

1 | **STEPHEN N. COLE  (SB #53319)**
**THE COLE LAW FIRM**
2 | 3410 Industrial Blvd., Suite 100
West Sacramento, CA 95691
3 | Tel: (916) 376-0486
Fax: (916) 376-0478
4 |
5 | Attorneys for Plaintiff
6 |
7 |
8 | **IN THE UNITED STATES DISTRICT COURT**
9 | **NORTHERN DISTRICT OF CALIFORNIA**
10 |
11 | PHILADELPHIA INDEMNITY                    Case No.
12 | INSURANCE COMPANY,
                                            **COMPLAINT IN SUBROGATION**
13 |                          Plaintiff,      **FOR DAMAGES**
14 |                  v.
15 | DANCO BUILDERS, DOES 1 to 10
Inclusive,
16 |
17 |                          Defendants.
18 |
19 |        Plaintiff PHILADELPHIA INDEMNITY INSURANCE COMPANY alleges:
20 | 1.     Philadelphia Indemnity Insurance Company is a corporation incorporated under the
21 |        laws of the State of Pennsylvania having its principal place of business in the State
22 |        of Pennsylvania.
23 |
24 | 2.     DANCO Builders is a corporation incorporated under the laws of the State of
25 |        California having its principal place of business in the State of California.
26 |
27 | 3.     Plaintiff is ignorant of the true names and capacities of defendants sued hereunder
28 |        as DOES 1 to 10, inclusive, and therefore sues these defendants by such fictitious

names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

4.   This action being between citizens of entirely different states, and involving matters in controversy which exceed $75,000 in value, exclusive of interest and costs, this Court has subject matter jurisdiction pursuant to 28 United States Code Sec. 1332(a).

5.   All of the Defendant's actions and agreements as set forth below took place within Humboldt County, California. Defendant's principal place of business being within Humboldt County. The venue of this action is in the Eureka Division of the Northern District of California, within which Humboldt County, California, pursuant to 28 United States Code Sec. 1391.

6.   Willow Creek Family Associates hereinafter "the insured" is, and at all times herein mentioned was, the owner of real property, hereinafter "the property," known as 520 N Highway 96, Willow Creek, California,   more particularly described as follows: Willow Creek Apartments.

7.   At all times herein mentioned, the insured was insured by Plaintiff under a policy of property insurance, hereinafter "the policy," by the terms of which Plaintiff insured the insured against, among other risks, any loss or damage resulting from any improper construction of a building on the property.

8. Defendant DANCO Builders, hereafter "defendant contractor," is, and at all times herein mentioned was, a corporation organized and existing under the laws of the

State of California, with its principal place of business in Humboldt County, and engaged in business as a general contractor.

9. On or about 2008 a fire occurred on the deck of apartment 526 of Building F of the Willow Creek Apartments.

10. Plaintiff's insured requested and Defendant agreed to provide all labor and materials and to repair the fire damage.

11. During and as part of his performance of the contract, and as a part of the fire damage repair, Defendant was negligent.

12. Defendant installed decking materials that violated the California Building Code.

13. Defendant knew or should have known that the installation of such decking was a violation of the Building Code.

14. Defendant so negligently performed the fire repair work that on December 16, 2013 fire engulfed the second level of apartment 526, Building F, originating at the deck, and spread to other portions of the building, damaging it.

15. As a proximate result of the negligence of Defendant and the damage to the building as herein alleged, the insured was required to, and did, make payments for repairs made the building to put it in proper condition.

16. The reasonable the cost of the repairs was $669,052.19, Plaintiff, pursuant to the terms of its policy, reimbursed its insured in the sum of $664,052.19, and thereby

became subrogated to all of the insured's rights, and is entitled to enforce all of the insured's remedies, against defendants.

17. WHEREFORE, Plaintiff prays judgment against defendant as hereinafter set forth.

Accordingly, the Plaintiffs each respectfully a resulting judgment to include the following relief (and any further relief which the Court may find to be justified by the evidence and by a jury's verdict):

1.    A monetary judgment requiring the Defendant to pay to the Plaintiff $664,052.19, an amount in compensatory damages to be proven at the trial hereof;

2. A monetary judgment requiring the Defendant to pay to the Plaintiff prejudgment interest on any amount of damages recovered; and

3.An award of reasonable court costs, and litigation expenses in a further amount determined by the Court after the return of any verdict in this proceeding.

This the 28th day of August, 2015.

Respectfully submitted,

By: _____

STEPHEN N. COLE
The Cole Law Firm
3410 Industrial Blvd., Suite 100
West Sacramento, CA 95691
Tel: (916) 376-0486
Fax: (916) 376-0478

# EXHIBIT 2

1 | **STEPHEN N. COLE** (SB #53319)
**THE COLE LAW FIRM**
2 | 3410 Industrial Blvd., Suite 100
West Sacramento, CA 95691
3 | Tel: (916) 376-0486
Fax: (916) 376-0478
4 |
5 | Attorneys for Plaintiff
6 |
7 |
8 |
9 | **IN THE UNITED STATES DISTRICT COURT**
10 | **NORTHERN DISTRICT OF CALIFORNIA**
11 |

| | |
|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | Case No.  15-cv-03945-WHO |
| Plaintiff, | **THIRD AMENDED COMPLAINT IN SUBROGATION FOR DAMAGES** |
| v. | |
| DANCO BUILDERS, DOES 1 to 10 Inclusive, | |
| Defendants. | |

As its Third Amended Complaint in this action, leave of court first had and received, Plaintiff PHILADELPHIA INDEMNITY INSURANCE COMPANY alleges:

**The Parties**

1. Philadelphia Indemnity Insurance Company is a corporation incorporated under the laws of the State of Pennsylvania having its principal place of business in the State of Pennsylvania.

2. DANCO Builders (hereinafter referred to as "DANCO") is a corporation incorporated under the laws of the State of California having its principal place of business in the State of California. At all times, DANCO was a general building contractor.

3.  Schmidbauer Building Supply (hereinafter referred to as "SCHMIDBAUER") is a limited liability company under the law of the State of California having its principal place of business in the State of California. At all times, SCHMIDBAUER engaged in business of retail sales of building supplies.

4.  Plaintiff is ignorant of the true names and capacities of defendants sued hereunder as DOES 1 to 10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

### Jurisdiction and Venue

5.  This action being between citizens of entirely different states, and involving matters in controversy which exceed $75,000 in value, exclusive of interest and costs, this Court has subject matter jurisdiction pursuant to 28 United States Code Sec. 1332(a).

6.  Defendants' actions, as set forth below, took place within Humboldt County, California. Defendants' principal place of business being within Humboldt County.

7.  The venue of this action is in the Eureka Division of the Northern District of California, within which Humboldt County, California, pursuant to 28 United States Code Sec. 1391.

### The Facts Applicable To All Causes Of Action

8.  Willow Creek Family Associates is, and at all times herein mentioned was, the owner of real property, hereinafter "the property," known as 520 N Highway 96, Willow Creek, California, more particularly described Willow Creek Apartments (hereinafter referred to as "WILLOW CREEK").

9.  Plaintiff insured WILLOW CREEK under a policy of property insurance by the terms of which it was insured against, among other risks, any loss or damage to the property under certain circumstances.

10. SCHMIDBAUER is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of California, with its principal place of business in Humboldt County, and engaged in business of retail sales of building supplies.

11. On September 1, 2006, Defendant, DANCO Builders and Willow Creek Family Associates entered into a contract in which DANCO agreed to serve as a general contractor and agreed to furnish all labor and purchase building materials for the construction of WILLOW CREEK.

12. WILLOW CREEK hired Eric Roberts, dba Pacific West Architecture, to provide plans, including specified building materials for WILLOW CREEK, to be used by DANCO.

13. On information and belief, DANCO selected and purchased wood plastic composite decking (hereinafter referred to as "DECKING") from SCHMIDBAUER.

14. The DECKING DANCO purchased from SCHMIDBAUER was not the DECKING Eric Roberts specified for use at WILLOW CREEK.

15. DANCO installed the DECKING in 2006, in its original construction of WILLOW CREEK.

16. On December 16, 2013 a tenant at the WILLOW CREEK disposed of a cigarette on the balcony of apartment 524, Building F. Rather than self-extinguishing, the fire ignited the DECKING and engulfed the second level of apartment 524, Building F, and spread to other portions of the building, damaging it.

17. WILLOW CREEK tendered its claim for all losses and damages resulting from the incident to Plaintiff.

18. The reasonable the cost of the repairs was $669,052.19, including loss of rent.

19. Upon information and belief, reasonable cost of repairs to the DECKING and siding as a result of the fire was $20,000.

20. Reasonable cost of repair of damages as a result of the spread of the fire was $649,052.19.

21. Plaintiff, pursuant to the terms of its policy, reimbursed its insured in the sum of $669,052.19, and thereby became subrogated to all of the insured's rights, and is entitled to enforce all of the insured's remedies, against defendants as to the repairs for the spread of the fire, of $649,052.19.

22. Plaintiff paid for the damages resulting from the incident in order to protect its own interest. Plaintiff did not act as a volunteer. Plaintiff was not primarily liable for the damages. Plaintiff paid the entire amount of damages due to the spread of the fire. Subrogation in this matter will not work as an injustice to the rights of others.

**Count 1 – Negligence (Danco Builders)**

23. PHILADELPHIA INDEMNITY INSURANCE COMPANY realleges and incorporates herein by reference paragraphs 1 through 22 as if fully set forth herein.

24. DANCO installed all DECKING at WILLOW CREEK..

25. DANCO knew or should have known when purchasing and installing the DECKING that it was composed of highly combustible materials and therefore unsafe, creating an unreasonable risk of injury and harm to WILLOW CREEK.

26. In 2006, DANCO was negligent in selecting, purchasing and installing DECKING at WILLOW CREEK.

27. On December 16, 2013 a tenant at the WILLOW CREEK disposed of a cigarette. Rather than self-extinguishing, the fire ignited the deck and engulfed the second level of apartment 524, Building F, and spread to other portions of the building, damaging it.

28. As a proximate result of the DANCO's negligence and the damage to the building as herein alleged, the insured was required to, and did, make payments for repairs made to the building.

29. WHEREFORE, Plaintiff prays judgment against DANCO as hereinafter set forth.

**Count 2 – 2006 Construction - Strict Product Liability (Schmidbauer Building Supplies)**

30. PHILADELPHIA INDEMNITY INSURANCE COMPANY realleges and incorporates herein by reference paragraphs 1 through 22 as if fully set forth herein.

31. On or about December 16, 2013 was damaged by the DECKING purchased from SCHMIDBAUER and installed by DANCO at WILLOW CREEK.

32. knew, or should have known that DECKING would be used without inspection for defects.

33. DECKING product was defective in design, manufacture and/or instruction when it left the control of the Defendant.

34. The DECKING was being used in the manner intended by the Defendants.

35. Plaintiff was the insurer of WILLOW CREEK, the DECKING product user.

36. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned that Defendant SCHMIDBAUER, was, and is, a distributor of building materials, including DECKING, for retail sale to the public, in the ordinary course of business.

37. Defendant SCHMIDBAUER sold the DECKING to DANCO.

38. At all times mentioned in this complaint, the DECKING was unsafe for its intended use.

39. The DECKING was being used in a manner foreseeable by SCHMIDBAUER..

40. As a direct and proximate cause of Defendant's sale of the DECKING, the insured was required to, and did, make payments for repairs made to the building.

41. WHEREFORE, plaintiff prays judgment as hereinafter set forth.

Accordingly, the Plaintiffs each respectfully a resulting judgment to include the following relief (and any further relief which the Court may find to be justified by the evidence and by a jury's verdict):

1     1.     A monetary judgment requiring the Defendants to pay to the Plaintiff

2 $649,052.19, an amount in compensatory damages to be proven at the trial

3 hereof;

4     2.     A monetary judgment requiring the Defendants to pay to the Plaintiff

5 prejudgment interest on any amount of damages recovered; and

6     3.     An award of reasonable court costs, and litigation expenses in a further

7 amount determined by the Court after the return of any verdict in this proceeding.

8 This 1st day of February 2016.

Respectfully submitted,

By: _____

STEPHEN N. COLE
The Cole Law Firm
3410 Industrial Blvd., Suite 100
West Sacramento, CA 95691
Tel: (916) 376-0486
Fax: (916) 376-0478

# EXHIBIT 3

1 | GEORGE D. YARON, ESQ. (Cal. State Bar #96246)
  | gyaron@yaronlaw.com
2 | D. DAVID STEELE, ESQ. (Cal. State Bar #171636)
  | dsteele@yaronlaw.com
3 | ERICA L. MORRIS, ESQ. (Cal. State Bar #307267)
  | emorris@yaronlaw.com
4 | **YARON & ASSOCIATES**
  | 1300 Clay Street, Suite 800
5 | Oakland, California 94612
  | Telephone: (415) 658-2929
6 | Facsimile: (415) 658-2930

7 | Attorneys for Defendant
  | DANCO BUILDERS

8 |

9 | UNITED STATES DISTRICT COURT

10 | NORTHER DISTRICT OF CALIFORNIA

11 |

12 | PHILADELPHIA INDEMNITY INSURANCE )     CASE NO. 15-cv-03945-WHO
   | COMPANY, )
13 | )     **DEFENDANT DANCO BUILDERS'**
   | Plaintiff, )     **SPECIAL INTERROGATORIES**
14 | )
   | )
15 | v. )
   | )
16 | DANCO BUILDERS, DOES 1 to 10 Inclusive, )
   | )
17 | Defendants. )
   | )
18 | )

19 |

20 | PROPOUNDING PARTY:     DEFENDANT DANCO BUILDERS

   | RESPONDING PARTY:     PLAINTIFF PHILADELPHIA INDEMNITY INSURANCE
21 | COMPANY

22 | SET NUMBER:     ONE

23 |        Defendant DANCO BUILDERS ("DANCO") requests that Plaintiff PHILADELPHIA

24 | INDEMNITY INSURANCE COMPANY ("PHILADELPHIA") answer under oath, within thirty (30)

25 | days, in accordance with Federal Rule of Civil Procedure 33, the following interrogatories.

26 |        You are hereby notified that at the commencement of trial of this case, DANCO will ask the

27 | Court for an order precluding you from introducing evidence related to the subject matter of the

28 | interrogatories which has not been disclosed by the answers to these interrogatories.

## DEFINITIONS

1.     The terms "YOU" and "YOUR" refers to Plaintiff PHILADELPHIA INDEMNITY INSURANCE COMPANY, anyone acting on its behalf, its agents, its employees, its companies, its attorneys, its accountants, its investigators, and anyone else acting on its behalf.

2.     The term "DANCO" refers to Defendant DANCO BUILDERS and/or its parent or subsidiary companies, successors, related entities, divisions, partners and joint venturers.

3.     The term "THIRD AMENDED COMPLAINT" refers to YOUR Third Amended Complaint, filed in this action on our about February 2, 2016.

4.     The term "SCHMIDBAUER" refers to Defendant SCHIMDBAUER BUILDING SUPPLY, as identified in the THIRD AMENDED COMPLAINT.

5.     The term "INSURED" refers to PHILADELPHIA's alleged insured, Willow Creek Family Associates, as identified in the THIRD AMENDED COMPLAINT.

6.     The term "WILLOW CREEK" refers to the INSURED's property, Willow Creek Apartments, as identified in the THIRD AMENDED COMPLAINT.

7.     The terms "REPAIRS" and "REPAIRED" means to restore by replacing a part or putting together a part that has been damaged or broken.

8.     The term "MANUFACTURED" means to make from raw materials by hand or by machinery.

9.     The term "IDENTIFY," when used in reference to a building, means to state the name, former name, owner, location and date of construction, locations and dates of conversion or repair for the particular building.

10.     The term "PERSON" includes natural persons, a firm, association, organization, partnership, business, trust, corporation, or public entity.

11.     The term "IDENTIFY," when used with respect to PERSON(s), shall mean a statement of the PERSON's full name, title, residential and business addresses, and telephone numbers.

12.     The term "IDENTIFY," when used in reference to a facility, means to state the name, street address, city, state, and zip code for each facility.

13.     The term "DOCUMENT" means a writing, as defined in Rule 1001 of the Federal Rules of Evidence, and includes, but is not limited to the originals, copies, hand written, printed, typed, photostat, photograph, or otherwise recorded materials, however produced or reproduced, of every kind and description in whatever form (e.g. final and draft versions), in your possession, custody, care, or control, including, but not limited to, all writings, correspondence, letters, notes, memoranda, reports, studies, charts, photographs, videotapes, accounting records, journals, calendars, appointment books, diaries, drawings, sound recordings, computer documents, computer diskettes, computer files, and other data compilations from which information can be obtained or translated. The term "DOCUMENT" also refers to originals and copies of all the above, upon which notations in writing, printed or otherwise, which do not appear on the originals.

14.     The term "IDENTIFY," when used in reference to "DOCUMENT(s)," means to describe specifically the DOCUMENT(s), including a description of its type (e.g., letter memorandum, telegram, chart, etc.), and to state its date, author, addressee, title, file identification number or symbol, and to identify the present location and the name and last known address of the present custodian of such DOCUMENT(s).  If any such DOCUMENT(s) are no longer in YOUR possession or subject to YOUR control, state what disposition was made and the time and date of such disposition, identifying any PERSON(s) having knowledge of its content.

15.     The term "IDENTIFY," when used in reference to a product, means to describe the product by the name under which it is sold in the market place (trade name), its generic name, or any slang or nickname used in YOUR occupation.

## SPECIAL INTERROGATORIES

**INTERROGATORY NO. 1:**

Please state all facts that support YOUR allegation in Paragraph 13 of the THIRD AMENDED COMPLAINT that, "On information and belief, DANCO selected and purchased wood plastic composite decking (hereinafter referred to as "DECKING") from SCHMIDBAUER."

**INTERROGATORY NO. 2:**

Please IDENTIFY all DOCUMENTS that support YOUR allegation in Paragraph 13 of the THIRD AMENDED COMPLAINT that, "On information and belief, DANCO selected and

1 | purchased wood plastic composite decking (hereinafter referred to as "DECKING") from

2 | SCHMIDBAUER."

3 | **INTERROGATORY NO. 3:**

4 | Please IDENTIFY all PERSON(s) who have knowledge supporting YOUR contention in

5 | Paragraph 13 of the THIRD AMENDED COMPLAINT that, "On information and belief, DANCO

6 | selected and purchased wood plastic composite decking (hereinafter referred to as "DECKING")

7 | from SCHMIDBAUER."

8 | **INTERROGATORY NO. 4:**

9 | Please state all facts that support YOUR allegation in Paragraph 14 of the THIRD

10 | AMENDED COMPLAINT that, "The DECKING DANCO purchased from SCHMIDBAUER was

11 | not the DECKING Eric Roberts specified for use at WILLOW CREEK."

12 | **INTERROGATORY NO. 5:**

13 | Please IDENTIFY all DOCUMENTS that support YOUR allegation in Paragraph 14 of the

14 | THIRD AMENDED COMPLAINT that, "The DECKING DANCO purchased from

15 | SCHMIDBAUER was not the DECKING Eric Roberts specified for use at WILLOW CREEK."

16 | **INTERROGATORY NO. 6:**

17 | Please IDENTIFY all PERSON(s) who have knowledge supporting YOUR contention

18 | Paragraph 14 of the THIRD AMENDED COMPLAINT that, "The DECKING DANCO purchased

19 | from SCHMIDBAUER was not the DECKING Eric Roberts specified for use at WILLOW

20 | CREEK."

21 | **INTERROGATORY NO. 7:**

22 | Please state all facts that support YOUR allegation in Paragraph 25 of the THIRD

23 | AMENDED COMPLAINT that, "DANCO knew or should have known when purchasing and

24 | installing the DECKING that it was composed of highly combustible materials and therefore unsafe,

25 | creating an unreasonable risk of injury and harm to WILLOW CREEK."

26 | **INTERROGATORY NO. 8:**

27 | Please IDENTIFY all DOCUMENT(s) supporting YOUR contention in Paragraph 25 of the

28 | THIRD AMENDED COMPLAINT that, "DANCO knew or should have known when purchasing

1 and installing the DECKING that it was composed of highly combustible materials and therefore

2 unsafe, creating an unreasonable risk of injury and harm to WILLOW CREEK."

3 **INTERROGATORY NO. 9:**

4     Please IDENTIFY all PERSON(s) who have knowledge supporting YOUR contention in

5 Paragraph 25 of the THIRD AMENDED COMPLAINT that, "DANCO knew or should have known

6 when purchasing and installing the DECKING that it was composed of highly combustible materials

7 and therefore unsafe, creating an unreasonable risk of injury and harm to WILLOW CREEK."

8 **INTERROGATORY NO. 10:**

9     Please state all facts that support YOUR allegation in Paragraph 26 of the THIRD

10 AMENDED COMPLAINT that, "In 2006, DANCO was negligent in selecting, purchasing and

11 installing DECKING at WILLOW CREEK."

12 **INTERROGATORY NO. 11:**

13     Please IDENTIFY all DOCUMENT(s) with knowledge supporting YOUR allegation in

14 Paragraph 26 of the THIRD AMENDED COMPLAINT that, "In 2006, DANCO was negligent in

15 selecting, purchasing and installing DECKING at WILLOW CREEK."

16 **INTERROGATORY NO. 12:**

17     Please IDENTIFY all PERSON(s) with knowledge supporting YOUR allegation in Paragraph

18 26 of the THIRD AMENDED COMPLAINT that, "In 2006, DANCO was negligent in selecting,

19 purchasing and installing DECKING at WILLOW CREEK."

20 **INTERROGATORY NO. 13:**

21     Please state all facts that support YOUR allegation in Paragraph 27 of the THIRD

22 AMENDED COMPLAINT that, "On December 16, 2013 a tenant at the WILLOW CREEK disposed

23 of a cigarette. Rather than self-extinguishing, the fire ignited the deck and engulfed the second level

24 of apartment 524, Building F, and spread to other portions of the building, damaging it."

25 **INTERROGATORY NO. 14:**

26     Please IDENTIFY all DOCUMENT(s) that support YOUR allegation in Paragraph 27 of the

27 THIRD AMENDED COMPLAINT that, "On December 16, 2013 a tenant at the WILLOW CREEK

28 disposed of a cigarette. Rather than self-extinguishing, the fire ignited the deck and engulfed the

1 | second level of apartment 524, Building F, and spread to other portions of the building, damaging
2 | it."

3 | **INTERROGATORY NO. 15:**

4 |      Please IDENTIFY all PERSON(s) with knowledge supporting YOUR allegation in Paragraph
5 | 27 of the THIRD AMENDED COMPLAINT that, "On December 16, 2013 a tenant at the WILLOW
6 | CREEK disposed of a cigarette. Rather than self-extinguishing, the fire ignited the deck and
7 | engulfed the second level of apartment 524, Building F, and spread to other portions of the building,
8 | damaging it."

9 | **INTERROGATORY NO. 16:**

10 |      Please state all facts that support YOUR allegation in Paragraph 28 of the THIRD
11 | AMENDED COMPLAINT that, "As a proximate result of the (sic) DANCO's negligence and the
12 | damage to the building as herein alleged, the insured was required to, and did, make payments for
13 | repairs to the building."

14 | **INTERROGATORY NO. 17:**

15 |      Please IDENTIFY all DOCUMENT(s) that support YOUR allegation in Paragraph 28 of the
16 | THIRD AMENDED COMPLAINT that, "As a proximate result of the (sic) DANCO's negligence
17 | and the damage to the building as herein alleged, the insured was required to, and did, make
18 | payments for repairs to the building."

19 | **INTERROGATORY NO. 18:**

20 |      Please IDENTIFY all PERSON(s) with knowledge supporting YOUR allegation in Paragraph
21 | 28 of the THIRD AMENDED COMPLAINT that, "As a proximate result of the (sic) DANCO's
22 | negligence and the damage to the building as herein alleged, the insured was required to, and did,
23 | make payments for repairs to the building."

24 | ///
25 | ///
26 | ///
27 | ///
28 | ///

1   DATED: March 30, 2016                 YARON & ASSOCIATES

2

3                                      By

4                                         GEORGE D. YARON
                                        D. DAVID STEELE

5                                         ERICA L. MORRIS
                                        Attorneys for Defendant

6                                         DANCO BUILDERS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2        I am over 18 years of age and not a party to the within action.  I am employed in the
County of Alameda; my business address is Yaron & Associates, 1300 Clay Street, Suite 800,

3  Oakland, California, 94612.

4        On **March 30, 2016,** I served the within:

5  **DEFENDANT DANCO BUILDERS' SPECIAL INTERROGATORIES, SET ONE**

6  as addressed below, by causing a true copy thereof to be distributed as follows:

7        SEE ATTACHED SERVICE LIST

8  **( X )**  **VIA U.S. MAIL:**  I am "readily familiar" with the firms practice of collection and processing
correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal service on that
9        same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion
10       of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than
one day after date of deposit for mailing in affidavit.

11  **( )**  **VIA HAND-DELIVERY:**  I caused such envelope, to be hand delivered to the stated parties via First
12       Legal Messenger Service.

13  **( X )**  **VIA E-MAIL:**  Pursuant to agreement, I caused such document to be sent via email to the offices of the
addressees so designated.
14

15        I declare under penalty of perjury under the laws of the State of California that the foregoing
is true and correct, and that this declaration was executed on **March 30, 2016,** at Oakland,
16  California

17

18                     _____

19                      Heather Garland

20

21

22

23

24

25

26

27

28

**SERVICE LIST ATTACHMENT**
*Philadelphia Indemnity Insurance Company v. Danco Builders*
U.S. District Court - Northern Dist. of California Case No. 3:15-cv-03945-WHO
Our File No. 4976

REPRESENTING:
**Plaintiffs, Philadelphia Indemnity**
**Insurance Company**
Stephen N. Cole, Esq.
THE COLE LAW FIRM
3410 Industrial Blvd., Suite 100
West Sacramento, CA 95691
Tel:     (916) 376-0486
Fax:     (916) 376-0478
scole@colenetlaw.com

REPRESENTING:
**Schmidbauer Building Supply**
Erik S. Faussner, Esq.
Steven E. McDonald, Esq.
BLEDSOE, DIESTEL, TREPPA AND
CRANE LLP
601 California Street, 16th Floor
San Francisco, CA 94105
Tel:     (415) 981-5411
Fax:     (415) 981-0352
efaussner@bledsoelaw.com
smcdonald@bledsoelaw.com

Page 1 of 1

# EXHIBIT 4

1  STEPHEN N. COLE  (SB #53319)
   **THE COLE LAW FIRM**
2  3410 Industrial Blvd., Suite 100
   West Sacramento, CA 95691
3  Tel: (916) 376-0486
   Fax: (916) 376-0478
4

5  Attorneys for Plaintiff

6

7

8

9                 **IN THE UNITED STATES DISTRICT COURT**

10               **NORTHERN DISTRICT OF CALIFORNIA**

11

12  PHILADELPHIA INDEMNITY            Case No.   15-cv-03945-WHO
    INSURANCE COMPANY,
13                                    **PLAINTIFF'S RESPONSES TO**
                          Plaintiff,  **DEFENDANT DANCO**
14                                    **BUILDERS' SPECIAL**
                     v.               **INTERROGATORIES**
15
    DANCO BUILDERS, DOES 1 to 10
16  Inclusive,
17                        Defendants.

18

19       Plaintiff PHILADEPHIA INDEMNITY INSURANCE COMPANY, by and

20  through its attorney of record, Stephen N. Cole responds to DANCO BUILDERS', First

21  Set of Special Interrogatories (NOS 1-18) as follows:

22                  **PRELIMINARY STATEMENT**

23  1. Plaintiff's investigation and development of all facts and circumstances relating to this

24  action is ongoing. These responses and objections are made without prejudice to, and are

25  not a waiver of, Plaintiff's right to rely on other facts or documents at trial.

26  2. By making the accompanying responses and objections to Defendant's interrogatories,

27  Plaintiff does not waive, and hereby expressly reserves, its right to assert any and all

28  objections as to the admissibility of such responses into evidence in this action, or in any

1  other proceedings, on any and all grounds including, but not limited to, competency,

2  relevancy, materiality, and privilege. Further, Plaintiff makes the responses and

3  objections herein without in any way implying that it considers the interrogatories, and

4  responses to the requests and interrogatory, to be relevant or material to the subject

5  matter of this action.

6  3. A response to an interrogatory stating that objections and/or indicating that documents

7  will be produced shall not be deemed or construed that there are, in fact, responsive

8  documents, that Plaintiff performed any of the acts described in the interrogatory, or

9  definitions and/or instructions applicable to the interrogatory, or that Plaintiff acquiesces

10 in the characterization of the conduct or activities contained in the interrogatory, or

11 definitions and/or instructions applicable to the interrogatory.

12 4. Plaintiff expressly reserves the right to supplement, clarify, revise, or correct any or all

13 of the responses and objections herein, and to assert additional objections or privileges,

14 in one or more subsequent supplemental response(s).

15 **SPECIAL INTERROGATORY NO. 1:**

16 Please state all facts that support YOUR allegation in Paragraph 13 of the THIRD

17 AMENDED COMPLAINT that, "On information and belief, DANCO selected and

18 purchased wood plastic composite decking (hereinafter referenced to as "DECKING")

19 from SCHMIDBAUER."

20 **RESPONSE TO SPECIAL INTERROGATORY NO. 1:**

21 Plaintiff objects to this interrogatory on the grounds that it seeks facts and/or information

22 that are covered by the attorney work product doctrine, the deliberative process

23 privilege, and the attorney-client privilege.  Plaintiff further object to the extent this

24 interrogatory seeks facts and/or information protected by Fed. R.Civ.P. 26(b)(3)(A) or

25 seeks the mental impressions, conclusions, opinions, legal research and legal theories of

26 Plaintiff's counsel. Without waiving any objections, Plaintiff responds that PacWest

27 hired Danco Builders to construct the Willow Creek project per the plans and

28 specifications.  Danco Builders did not comply with those plans.

**SPECIAL INTERROGATORY NO. 2:**

Please IDENTIFY all DOCUMENTS that support YOUR allegation in Paragraph 13 of the THIRD AMENDED COMPLAINT that, "On information and belief, DANCO selected and purchased wood plastic composite decking (hereinafter referred to as "DECKING") from SCHMIDBAUER."

**RESPONSE TO SPECIAL INTERROGATORY NO. 2:**

Plaintiff objects to this interrogatory on the grounds that it seeks facts and/or information that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further object to the extent this interrogatory seeks facts and/or information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. Without waiving any objections, Plaintiff responds that PacWest hired Danco Builders to construct the Willow Creek project per the plans and specifications. Danco Builders did not comply with those plans.

**SPECIAL INTERROGATORY NO. 3:**

Please IDENTIFY all PERSON(s) who have knowledge supporting YOUR contention in Paragraph 13 of the THIRD AMENDED COMPLAINT that, "On information and belief, DANCO selected and purchased wood plastic composite decking (hereinafter referred to as "DECKING") from SCHMIDBAUER."

**RESPONSE TO SPECIAL INTERROGATORY NO. 3:**

Plaintiff objects to this interrogatory on the grounds that it seeks facts and/or information that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further object to the extent this interrogatory seeks facts and/or information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. Without waiving any objections, Plaintiff responds: Dan Johnson, Eric Roberts, and Pacific West personnel.

**SPECIAL INTERROGATORY NO. 4:**

Please state all facts that support YOUR allegation in Paragraph 14 of the THIRD AMENDED COMPLAINT that, "The DECKING DANCO purchased from SCHMIDBAUER was not the DECKING Eric Roberts specified for use at WILLOW CREEK."

**RESPONSE TO SPECIAL INTERROGATORY NO. 4:**

Plaintiff objects to this interrogatory on the grounds that it seeks facts and/or information that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further object to the extent this interrogatory seeks facts and/or information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. Without waiving any objections, Plaintiff responds that the plans and specifications speak for themselves.

**SPECIAL INTERROGATORY NO. 5:**

Please IDENTIFY all DOCUMENTS that support YOUR allegation in Paragraph 14 of the THIRD AMENDED COMPLAINT that, "The DECKING DANCO purchased from SCHMIDBAUER was not the DECKING Eric Roberts specified for use at WILLOW CREEK."

**RESPONSE TO SPECIAL INTERROGATORY NO. 5:**

Plaintiff objects to this interrogatory on the grounds that it seeks facts and/or information that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further object to the extent this interrogatory seeks facts and/or information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. Without waiving any objections, Plaintiff responds: Dan Johnson's emails and building plans.

**SPECIAL INTERROGATORY NO. 6:**

Please IDENTIFY all PERSON(s) who have knowledge supporting YOUR contention

in Paragraph 14 of the THIRD AMENDED COMPLAINT that, "The DECKING DANCO purchased from SCHMIDBAUER was not the DECKING Eric Roberts specified for use at WILLOW CREEK."

**RESPONSE TO SPECIAL INTERROGATORY NO. 6:**

Plaintiff objects to this interrogatory on the grounds that it seeks facts and/or information that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege.  Plaintiff further object to the extent this interrogatory seeks facts and/or information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. Without waiving any objections, Plaintiff responds:  Dan Johnson.

**SPECIAL INTERROGATORY NO. 7:**

Please state all facts that support YOUR allegation in Paragraph 25 of the THIRD AMENDED COMPLAINT that, "DANCO knew or should have known when purchasing and installing the DECKING that it was composed of highly combustible materials and therefore unsafe, creating an unreasonable risk of injury and harm to WILLOW CREEK."

**RESPONSE TO SPECIAL INTERROGATORY NO. 7:**

Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege.  Plaintiff further object to the extent this Interrogatory seeks facts and information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. To the extent this interrogatory calls for information contained in the notes and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the interrogatory as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to the interrogatory, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

**SPECIAL INTERROGATORY NO. 8:**

Please IDENTIFY all DOCUMENT(s) supporting YOUR contention in Paragraph 25 of the THIRD AMENDED COMPLAINT that, "DANCO knew or should have known when purchasing and installing the DECKING that it was composed of highly combustible materials and therefore unsafe, creating an unreasonable risk of injury and harm to WILLOW CREEK."

**RESPONSE TO SPECIAL INTERROGATORY NO. 8:**

Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege.  Plaintiff further object to the extent this Interrogatory seeks facts and information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. To the extent this interrogatory calls for information contained in the notes and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the interrogatory as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to the interrogatory, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

**SPECIAL INTERROGATORY NO. 9:**

Please IDENTIFY all PERSON(s) who have knowledge supporting YOUR contention in Paragraph 25 of the THIRD AMENDED COMPLAINT that, "DAN CO knew or should have known when purchasing and installing the DECKING that it was composed of highly combustible materials and therefore unsafe, creating an unreasonable risk of injury and harm to WILLOW CREEK."

**RESPONSE TO SPECIAL INTERROGATORY NO. 9:**

Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege.  Plaintiff further object to the extent this Interrogatory seeks

1   facts and information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental

2   impressions, conclusions, opinions, legal research and legal theories of Plaintiff's

3   counsel. To the extent this interrogatory calls for information contained in the notes

4   and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the

5   interrogatory as premature and expressly reserves the right to supplement, clarify, revise,

6   or correct any or all responses to the interrogatory, and to assert additional objections or

7   privileges, in one or more subsequent supplemental response(s) in accordance with the

8   time period for exchanging expert reports set by the Court.

9   **SPECIAL INTERROGATORY NO. 10:**

10   Please state all facts that support YOUR allegation in Paragraph 26 of the THIRD

11   AMENDED COMPLAINT that, "In 2006, DANCO was negligent in selecting,

12   purchasing and installing DECKING at WILLOW CREEK."

13   **RESPONSE TO SPECIAL INTERROGATORY NO. 10:**

14   Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered

15   by the attorney work product doctrine, the deliberative process privilege, and the

16   attorney-client privilege.  Plaintiff further object to the extent this Interrogatory seeks

17   facts and information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental

18   impressions, conclusions, opinions, legal research and legal theories of Plaintiff's

19   counsel. To the extent this interrogatory calls for information contained in the notes

20   and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the

21   interrogatory as premature and expressly reserves the right to supplement, clarify, revise,

22   or correct any or all responses to the interrogatory, and to assert additional objections or

23   privileges, in one or more subsequent supplemental response(s) in accordance with the

24   time period for exchanging expert reports set by the Court.

25   **SPECIAL INTERROGATORY NO. 11:**

26   Please IDENTIFY all DOCUMENT(s) with knowledge supporting YOUR allegation in

27   Paragraph 26 of the THIRD AMENDED COMPLAINT that, "In 2006, DANCO was

28   negligent in selecting, purchasing and installing DECKING at WILLOW CREEK."

**RESPONSE TO SPECIAL INTERROGATORY NO. 11:**

Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege.  Plaintiff further object to the extent this Interrogatory seeks facts and information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. To the extent this interrogatory calls for information contained in the notes and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the interrogatory as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to the interrogatory, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

**SPECIAL INTERROGATORY NO. 12:**

Please IDENTIFY all PERSON(s) with knowledge supporting YOUR allegation in Paragraph 26 of the THIRD AMENDED COMPLAINT that, "In 2006, DANCO was negligent in selecting, purchasing and installing DECKING at WILLOW CREEK."

**RESPONSE TO SPECIAL INTERROGATORY NO. 12:**

Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege.  Plaintiff further object to the extent this Interrogatory seeks facts and information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. To the extent this interrogatory calls for information contained in the notes and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the interrogatory as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to the interrogatory, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

**SPECIAL INTERROGATORY NO. 13:**

Please state all facts that support YOUR allegation in Paragraph 27 of the THIRD AMENDED COMPLAINT that, "On December 16, 2013 a tenant at the WILLOW CREEK disposed of a cigarette. Rather than self-extinguishing, the fire ignited the deck and engulfed the second level of apartment 524, Building F, and spread to other portions of the building, damaging it."

**RESPONSE TO SPECIAL INTERROGATORY NO. 13:**

Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further object to the extent this Interrogatory seeks facts and information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. To the extent this interrogatory calls for information contained in the notes and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the interrogatory as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to the interrogatory, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

**SPECIAL INTERROGATORY NO. 14:**

Please IDENTIFY all DOCUMENT(s) that support YOUR allegation in Paragraph 27 of the THIRD AMENDED COMPLAINT that, "On December 16,2013 a tenant at the WILLOW CREEK disposed of a cigarette. Rather than self-extinguishing, the fire ignited the deck and engulfed the second level of apartment 524, Building F, and spread to other portions of the building, damaging it."

**RESPONSE TO SPECIAL INTERROGATORY NO. 14:**

Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further object to the extent this Interrogatory seeks

1  facts and information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental

2  impressions, conclusions, opinions, legal research and legal theories of Plaintiff's

3  counsel. To the extent this interrogatory calls for information contained in the notes

4  and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the

5  interrogatory as premature and expressly reserves the right to supplement, clarify, revise,

6  or correct any or all responses to the interrogatory, and to assert additional objections or

7  privileges, in one or more subsequent supplemental response(s) in accordance with the

8  time period for exchanging expert reports set by the Court.

9  **SPECIAL INTERROGATORY NO. 15:**

10  Please IDENTIFY all PERSON(s) with knowledge supporting YOUR allegation in

11  Paragraph 27 of the THIRD AMENDED COMPLAINT that, "On December 16,2013 a

12  tenant at the WILLOW CREEK disposed of a cigarette. Rather than self-extinguishing,

13  the fire ignited the deck and engulfed the second level of apartment 524, Building F, and

14  spread to other portions of the building, damaging it."

15  **RESPONSE TO SPECIAL INTERROGATORY NO. 15:**

16  Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered

17  by the attorney work product doctrine, the deliberative process privilege, and the

18  attorney-client privilege.  Plaintiff further object to the extent this Interrogatory seeks

19  facts and information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental

20  impressions, conclusions, opinions, legal research and legal theories of Plaintiff's

21  counsel. To the extent this interrogatory calls for information contained in the notes

22  and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the

23  interrogatory as premature and expressly reserves the right to supplement, clarify, revise,

24  or correct any or all responses to the interrogatory, and to assert additional objections or

25  privileges, in one or more subsequent supplemental response(s) in accordance with the

26  time period for exchanging expert reports set by the Court.

27

28

**SPECIAL INTERROGATORY NO. 16:**

Please state all facts that support YOUR allegation in Paragraph 28 of the THIRD AMENDED COMPLAINT that, "As a proximate result of the (sic) DANCO's negligence and the damage to the building as herein alleged, the insured was required to, and did, make payments for repairs to the building."

**RESPONSE TO SPECIAL INTERROGATORY NO. 16:**

Plaintiff objects to this Interrogatory on the grounds that it seeks facts that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further object to the extent this Interrogatory seeks facts and information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. To the extent this interrogatory calls for information contained in the notes and/or memoranda prepared by the potential testifying expert, Plaintiff objects to the interrogatory as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to the interrogatory, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

**SPECIAL INTERROGATORY NO. 17:**

Please IDENTIFY all DOCUMENT(s) that support YOUR allegation in Paragraph 28 of the THIRD AMENDED COMPLAINT that, "As a proximate result of the (sic) DANCO's negligence and the damage to the building as herein alleged, the insured was required to, and did, make payments for repairs to the building."

**RESPONSE TO SPECIAL INTERROGATORY NO. 17:**

Plaintiff objects to this interrogatory on the grounds that it seeks facts and/or information that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further object to the extent this interrogatory seeks facts and/or information protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of

Plaintiff's counsel. Without waiving any objections, Plaintiff states: the insurance policy and independent adjuster reports.

**SPECIAL INTERROGATORY NO. 18:**

Please IDENTIFY all PERSON(s) with knowledge supporting YOUR allegation in Paragraph 28 of the THIRD AMENDED COMPLAINT that, "As a proximate result of the (sic) DANCO's negligence and the damage to the building as herein alleged, the insured was required to, and did, make payments for repairs to the building."

**RESPONSE TO SPECIAL INTERROGATORY NO. 18:**

Plaintiff objects to this interrogatory on the grounds that it seeks facts and/or information that are covered by the attorney work product doctrine, the deliberative process privilege, and the attorney-client privilege. Plaintiff further object to the extent this interrogatory seeks protected by Fed. R.Civ.P. 26(b)(3)(A) or seeks the mental impressions, conclusions, opinions, legal research and legal theories of Plaintiff's counsel. Without waiving any objections, Plaintiff states: handling and independent adjusters.

DATED: April 12, 2016

THE COLE LAW FIRM

By_____

STEPHEN N. COLE
Attorney for Plaintiff
The Cole Law Firm
3410 Industrial Blvd., Suite 100
West Sacramento, CA 95691
Tel: (916) 376-0486
Fax: (916) 376-0478

## *PROOF OF SERVICE*

I, KIM BRADLEY, declare:

I am employed in the County of Yolo, State of California; I am over the age of 18, and not a party to the within action; my business address is 3410 Industrial Blvd., Suite 100, West Sacramento, CA 95691.

On April 2**9**, 2016, I served the following document described as:

**PLAINTIFF'S RESPONSES TO SPECIAL INTERROGATORIES**

On all parties in said cause, addressed as follows:

> *George D. Yaron, Jr.*
> *David Steele*
> *YARON & ASSOCIATES*
> *1300 Clay St.*
> *Suite 800*
> *Oakland, CA  94612*
>
> *Steven McDonald, Esq.*
> *Bledsoe, Diestel, Treppa & Crane LLP*
> *601 California Street Fl 16*
> *San Francisco, CA  94108*

✓ **BY MAIL.** I placed a true and correct copy thereof in a sealed envelope(s) addressed to the foregoing. I caused such envelopes with postage thereon fully prepaid to be placed in the United States mail in the County of Yolo.

_____ **BY PERSONAL SERVICE.** I caused such envelopes to be delivered by hand to the offices of the addressee.

_____ **BY FACSIMILE.** I caused such documents to be sent to the address above via the facsimile number indicated.

_____ **BY EXPRESS MAIL.** I caused such documents to be deposited into a designated express mail box for pickup on the date of execution of this declaration.

✓ **BY E-MAIL OR ELECTRONIC SERVICE.** Based on agreement of the parties to accept service by e-mail or electronic transmission, I caused such documents to the persons listed above. I did not receive, within a reasonable time after transmission any electronic message that the transmission was unsuccessful.

I am "readily familiar" with this firm's business practice for collection and processing of correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party

1    served, service is presumed invalid if postal cancellation date or postage meter date is more than

2    one (1) day after the date of deposit for mailing in affidavit.

3         I declare under penalty of perjury, under the laws of the State of California, that the

4    foregoing is true and correct and that this Declaration was executed at West Sacramento,

5    California on April 29, 2016.

6

7                                            _KIM BRADLEY_____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 5

THE COLE LAW FIRM
STEPHEN N. COLE (SB #53319)
3410 Industrial Blvd., Suite 100
West Sacramento, CA 95691
Telephone:    (916) 376-0486
Facsimile:    (916) 376-0478

Attorneys for Plaintiff
Philadelphia Indemnity Insurance Company

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

PHILADELPHIA INDEMNITY
INSURANCE COMPANY,

                            Plaintiff,

            v.

DANCO BUILDERS, DOES 1 to 10
Inclusive,

                            Defendants.

Case No. 15-cv-03945-WHO

EXPERT WITNESS
DISCLOSURE

I.      QUALIFICATIONS

        I, Jeff Hughes, am a Construction Manager with the Construction Consulting,

Management, Safety & Engineering firm WEXCO International Corporation.  A copy of

my resume is attached as **Exhibit A**.  In the course of my professional practice, I am a

construction manager and general contractor in the State of California and possess a

general contractor B license.  I have been working in the construction industry since

1987 as a designer, professional construction estimator, supervisor and project manager

of construction projects.  I am a Certified by the International Code Council as a

Building Inspector in the state of California.  I am a Certified, through the American

Society of Professional Estimators (ASPE), as a Professional Construction Estimator.  I

am CalOSHA 10 and CalOSHA 30 construction safety certified.  In addition, I have

1      **2)** The decking, siding, moisture barrier, soffit, attic draft stop did not comply

2 with the plans, specifications or contract, where the most restrictive material is to be

3 used in the event of an inconsistency or conflict where no RFI is administered by

4 DANCO. In these critical materials, DANCO failed to comply with the standard of care

5 of the industry to issue an RFI to the Architect or Engineer and failed in installing the

6 most restrictive material.

7      **3)** The construction of the second floor decks by defendant DANCO and/or his

8 subcontractor did not conform with the approved Architectural Plans, Sections and

9 Details within generally accepted construction standards based on the information

10 available to the defendant prior to, and during, construction.

11      **4)** The construction of the second floor decks by defendant DANCO and/or his

12 subcontractor did not conform with the Industry Standards and/or Standard of Care

13 based on the information available to the defendant prior to, and during, construction.

14 The 1997 Urban-Wildland Interface Code dictates guidelines for safe building materials

15 to be used in an Urban-Wildland area.  Section 504.7 Appendages and Projections

16 (including siding, soffits and decks), requires a minimum of one-hour-rated fire resistive

17 construction …or approved non-combustible materials.  The exterior siding did not

18 comply with safe building practices, nor the 1997 Urban-Wildland Interface Code nor

19 the 2000 Urban-Wildland Interface Code nor the 2003 Urban-Wildland Interface Code.

20      **5)** The Structural Plans and the Architectural Plans had, in their designs,

21 inconsistent balcony decking materials and/or construction details (i.e. open Vinyl

22 Decking v. solid Concrete Decking), DANCO knew, or should have known of the

23 inconsistency during the bidding phase (prior to construction), during the submittal

24 process and/or throughout the construction process.

25          .1) Per the Contract (between DANCO and the Owner), Section 3.2

26          Review of Contract Documents and Field Conditions by Contractor, subsection

27          .1, the contractor had a duty to report the inconsistency to the Architect promptly

28

AHJ's passing a particular inspection does not relieve the contractor from complying with the building code. Furthermore, the construction contract obligates DANCO to follow the plans and specifications. Dan Johnson, at his deposition, affirmed that obligation. (See 2001 CA Building Code, Chapter 1 - Administration, Section 104 - Organization and Enforcement, subsection 2 Powers and Duties of Building Official and sub-subsection 6 Liability. *This code shall not be construed to relieve from or lessen the responsibility of any person owning, operating or controlling any building or structure for any damages to persons or property caused by defects, nor shall the code enforcement agency or its parent jurisdiction be held as assuming any such liability by reason of the inspections authorized by this code or any permits or certificates issued under this code.*

VI.   COMPENSATION

WEXCO has incurred $19,400 for services rendered through the date of this report to the attorneys representing Plaintiff. Billings for future services, including testifying at deposition and trial, will be at $300 per hour.

Dated: 10/27/16          Signed:

Jeff Hughes, CM, GC, CRBI, CPE

Dated: 10/27/16          Signed:

Stephen N. Cole, Attorney for
Plaintiff, Philadelphia Indemnity
Insurance Company

EXPERT WITNESS DISCLOSURE - PAGE 27

[CASE NO.: 15-cv-03945-WHO]

# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4   PHILADELPHIA INDEMNITY      ) Case No. 15-cv-03945 WHO
     INSURANCE COMPANY,          )
 5                               )
                Plaintiff,       )
 6                               )          CERTIFIED COPY
        v.                       )
 7                               )
     DANCO BUILDERS, DOES 1 to   )
 8   10, inclusive,              )
                                 )
 9              Defendants.      )
     _____)

10

11

12

13                      -  -  -

14        DEPOSITION OF LARRY PELTON, CFEI, Volume I

15        _____

16              Friday, August 19, 2016

17

18

19

20   REPORTED BY:   BEVERLY HEDBERG, CCRR, CSR No. 4256

21

22

23

24                                  Fountaingrove Corporate Centre
                                    3510 Unocal Place, Suite 115
                                    Santa Rosa, CA 95403
25                                  800.368.6833 | 707.526.2708
                                    redwoodreporting.com
```

```
 1              At Redwood Reporting & Videoconferencing, 3510

 2   Unocal Place, Suite 115, Santa Rosa California, on

 3   Friday, August 19, 2016, commencing at the hour of 9:03

 4   a.m. thereof, before Beverly A. Hedberg, a Certified

 5   Shorthand Reporter, there personally appeared

 6                        LARRY PELTON, CFEI

 7   for said deposition.

 8                        -  -  -

 9                      EXAMINATION

10   BY MR. STEELE:

11      Q.   Good morning, sir.  Can you state and spell

12   your name for the record.

13      A.   Larry Edward Pelton.  Pelton is P-e-l-t-o-n.

14           MR. STEELE:  And let's mark as Exhibit 1 the

15   notice of the deposition.

16           (Deposition Exhibit 1 was marked for

17   identification.)

18   BY MR. STEELE:

19      Q.   Mr. Pelton, I'm showing you Exhibit 1, which

20   is the second amended notice of the deposition.  Do you

21   see that, sir?

22      A.   Yes.

23      Q.   Do you understand that you're being produced

24   as a Rule 30(b)(6) witness for the plaintiff,

25   Philadelphia Indemnity Insurance Company?
```

1      A.    Yes, I do.

2      Q.    Have you reviewed Exhibit 1 prior to today?

3      A.    Yes.

4      Q.    Okay.   Have you produced documents responsive

5    to the request in Exhibit 1?

6      A.    Yes.

7            MR. COLE:   Objection.   We had discussed

8    previously the purpose of Mr. Pelton's deposition.   He's

9    not being proffered as a 30(b)(6) witness in each of the

10    categories; solely in the origin, cause and spread of

11    the fire.

12            MR. STEELE:   Is there someone else who is

13    going to be proffered in the categories that he's not?

14            MR. COLE:   Correct.

15            MR. STEELE:   Who is that?

16            MR. COLE:   Well, each category, I'll have to

17    take a look at.   I mean, it could be one or more people.

18    You asked for, for example, of copy of the insurance

19    policy.   You asked for a copy of the payment schedule,

20    et cetera, et cetera.   So I'm not foreclosing you from

21    deposing additional 30(b)(6) witnesses in the areas in

22    which Mr. Pelton is not being deposed.

23    BY MR. STEELE:

24      Q.    All right.   What have you brought to this

25    deposition today, Mr. Pelton?

Larry Pelton, CFEI, Volume I 8/19/2016

1   box, in your opinion, on a more-likely-than-not basis,

2   correct?

3        A.   Yes.

4        Q.   All right.  And after this conversation with

5   Nancy Cheatham and formulating your opinions and

6   continuing your investigation, you made the tentative

7   conclusion that the Christmas lights were not the source

8   of ignition, correct?

9        A.   Correct.

10       Q.   Was there a third fuel after the cardboard

11   box, in your opinion?

12       A.   Yes.

13       Q.   What was that?

14       A.   The decking material.

15       Q.   What's your basis for that?

16       A.   Because of the large area of burning; the

17   amount of melting to it.  Eventually, the testing that

18   was done on the plastic composite-type decking.

19       Q.   Why wasn't the -- what was the siding made out

20   of on the north wall where the cardboard box and paper

21   bag were?

22       A.   It was vinyl siding over the top of OSB strand

23   board.

24       Q.   Was there damage to the vinyl siding on

25   Apartment F that you saw?

Larry Pelton, CFEI, Volume I 8/19/2016

1      A.   Yes.

2      Q.   Why wasn't the vinyl siding the third fuel

3 source?

4      A.   Well, as I said before, I don't know for sure

5 how much heating the cardboard box did.  There's no way

6 of knowing.  Since the plastic was melted away in that

7 area, I don't know if that would have been the third

8 fuel source or the fourth fuel source.  It was somewhere

9 involved in that sequence close in time, probably, to

10 the time the deck boards would have went up.

11      Q.   So to be clear, you're not sure if the deck

12 was the third fuel source.  It could have been the

13 siding, correct?

14      A.   It could have been the siding.  I just know

15 that the siding is a vinyl siding, and I don't believe

16 from the patterns on there that it burns at as high a

17 heat rate, obviously, as the decking does.  I just don't

18 know the sequence of that.  And then eventually you had

19 OSB siding that ignited.

20      Q.   Okay.  At what point in the progress of the

21 fire that you're describing did the transition to flame

22 occur?

23      A.   It would have been when the cigarette  -- the

24 smoldering cigarette ignited the light combustibles

25 inside the trash bag.  That's when it would have went to

1            REPORTER'S CERTIFICATE

2        I, BEVERLY A. HEDBERG, a Certified Shorthand

3   Reporter, licensed in the State of California, License

4   No. 4256, hereby certify that the deponent was by me

5   first duly sworn, and the foregoing testimony was

6   reported by me and was thereafter transcribed with

7   computer-aided transcription; that the foregoing is a

8   full, complete, and true record of said proceedings.

9        I further certify that I am not of counsel or

10  attorney for either of the parties in the foregoing

11  proceeding and caption named or in any way interested in

12  the outcome of the cause in said caption.

13       The dismantling, unsealing, or unbinding of the

14  original transcript will render the reporter's

15  certificates null and void.

16       In witness whereof, I have hereunto set my hand

17  this day:

18       [X] Reading and Signing was requested.

19       [-] Reading and Signing was waived.

20       [ ] Reading and signing was not requested.

21  DATED:  August 26, 2016

22

23

24

25                    Beverly A. Hedberg, CCRR, CSR #4256

1

2
        August 26, 2016
3

4       Larry Pelton, CFEI
        P.O. Box 2826
5       Rohnert Park, California 94927

6       RE:  Philadelphia Indemnity Insurance Company vs. Danco
        Builders
7
        Dear Mr. Pelton:
8
        Notice is hereby given that the original transcript of
9       your deposition, taken August 19, 2016, is available for
        your reading, correcting and signing.  This review is
10      not mandatory.

11      Pursuant to CCP 2025.520, for 30 days following the date
        of this notice you may change the form or substance of
12      an answer to any question.  You may make changes to the
        original transcript at our office or a certified copy if
13      permitted by the code.

14      Forward any changes and/or signature to our office.
        Upon receipt, we will include such in the original
15      transcript as well as notify all counsel.

16      Please telephone this office for an appointment if you
        desire to review the original transcript.
17

18      Sincerely,

19      *Redwood Reporting*

20

21

22      Cc:  Counsel of record

23              REDWOOD REPORTING & VIDEOCONFERENCING
                   3510 Unocal Place, Suite 115
24                    Santa Rosa, CA 95403
                E-MAIL: depos@redwoodreporting.com
25                       (800) 368-6833

# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

| | |
|---|---|
| PHILADELPHIA INDEMNITY | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) 3:15-cv-03945-WHO |
| vs. | ) |
| | ) |
| DANCO BUILDERS, DOES 1 to 10 | ) |
| Inclusive, | ) |
| | ) |
| Defendants. | ) |
| | ) |

EXPERT DEPOSITION OF

JEFF HUGHES

January 10, 2017

8:54 a.m.

1300 Clay Street, Suite 800

Oakland, California

Reported by:  Michelle L. Archuletta, CSR No. 11028



1    A.   Yes.

2    Q.   All right.  It says "Code references."

3         Do you see that?

4    A.   Yes.

5    Q.   First item marked is California Building Code,

6  correct?

7    A.   Correct.

8    Q.   Then there's the California Plumbing Code, and

9  the California Mechanical Code, and then there is the

10 California Electrical Code, right?

11   A.   Correct.

12   Q.   And do you see anywhere that the design

13 criteria in Exhibit 8 includes WUI, W-U-I, code or

14 specifications?

15   A.   No.

16   Q.   And is that true throughout the entire full set

17 of plans, as you sit here now?  Do you know if anywhere

18 in the architectural plans for Willow Creek there was a

19 mention that the apartment complex should be built with

20 the WUI standards as a design criteria?

21   A.   It doesn't specifically refer to the WUI.

22   Q.   The plans don't refer to the WUI, correct?

23   A.   Correct.  Not explicitly.

24   Q.   Okay.  And do you have any evidence that the --

25 the architect for the Willow Creek Apartments was a man



1  BY MR. STEELE:

2      Q.   Mr. Hughes, I'm showing you Exhibit 10, and

3  this is a document produced by the plaintiff.  It's a --

4  from QAI Laboratories.  It's dated July 13th, 2016.

5           Do you see that?

6      A.   Yes.

7      Q.   I couldn't tell if this was part of your file.

8  My initial thought that it was not, but I don't know.

9           Do you know if you've seen this document

10  before?

11      A.   I don't believe it's referred to in my

12  Information Reviewed file.

13      Q.   So, hypothetically, if the green deck was

14  sampled by QAI Laboratories and was tested and reported

15  to have a flame spread of 150, that would meet the

16  classification of a Class C for decking, correct?

17      A.   I believe so.

18      Q.   All right.

19      A.   It's certainly high.

20      Q.   I didn't ask that, but that's fine.

21           At the time that Willow Creek Apartments was

22  being constructed, the California Building Code

23  permitted a deck to have a Class C classification,

24  correct?

25      A.   I would have to look at the code to see that.



1    Q.   You don't know one way or the other as you sit

2  here?

3    A.   I'd have to look at the code.

4    Q.   That's fine.  But please answer my question.

5  As you sit here without looking at the code, you don't

6  know one way or the other whether the Class C

7  classification for a deck satisfied the California

8  Building Code at the time that this apartment complex

9  was built, correct?

10   A.   As I sit here right now without looking at the

11 code, I don't recall.

12   Q.   Okay.  Now, the plans didn't -- the

13 architectural plans did not call for a redwood deck

14 anywhere, correct?

15   A.   Correct.

16   Q.   And the architectural plans did not call for a

17 Douglas-fir deck anywhere, correct?

18   A.   As a finished product, correct.

19   Q.   All right.  And you don't know whether the

20 green deck has a similar classification for flame spread

21 as the Ultra Guard vinyl deck noted in the plans,

22 correct?

23   A.   As I sit here, I don't.

24   Q.   All right.  Continuing with your expert report.

25 We don't have a page number, but it's No. 3 under



1   until it's adopted by a particular jurisdiction, right?

2   Force of law, that's the emphasis.

3       A.   That's my understanding.

4       Q.   Okay.  So, and if you go to the page 5 of this

5   document, it says about the International Fire Code

6   Institute, that looks like the entity that publishes the

7   WUI standard, right?

8       A.   That published it, yes.

9       Q.   Okay.  And it's a not-for-profit public service

10  benefit corporation dedicated to public safety, true?

11      A.   Correct.

12      Q.   So it's an organization that says we are very

13  smart and we have studied the issue of fires

14  internationally and here's what we think is a very good

15  model code for various places around the globe to adopt,

16  and that will reduce fire damages and hazards in our

17  opinion.  I've given you a lay description.

18           Is that fair of what the International Fire

19  Code Institute is doing with respect to the WUI?

20      A.   I think so.

21      Q.   Okay.  If you look on -- if you go to page 9,

22  it says, "Codes and Related Publications," right?

23      A.   Correct.

24      Q.   And it says, "The International Conference of

25  Building Officials (ICBO) publishes a family of codes,



1   the WUI, although it's not codified, applies.

2       Q.    That's -- the last part of your answer gets us

3   at least closer, all right?  I understand you're

4   claiming, Mr. Hughes, that the WUI standard applies,

5   right?  That is clearly in your expert report.  I'm

6   asking whether it was codified in California at the time

7   that this deck was installed at the Willow Creek

8   apartment complex.  The answer is no, correct?

9       A.    The document itself, no.  Period.

10      Q.    What document?

11      A.    The WUI code itself was not codified until

12  2008.

13      Q.    Okay.  After this Willow Creek apartment

14  complex was built and after the green deck was

15  installed, correct?

16      A.    It would appear so from the records.

17      Q.    Okay.  Thank you.

18          MR. COLE:  Can we take a biologic break?

19          MR. STEELE:  Of course, we can.

20          (Recess.)

21  BY MR. STEELE:

22      Q.    Do you hold the architect in this case

23  responsible for adhering to the WUI standard for

24  designing the Willow Creek apartment complex?

25      A.    To a certain degree, yes.



1    Q.    To what degree?

2    A.    Well, they're the ones that designed the

3 project.

4    Q.    Right.

5    A.    And so they are the ones that are tasked with

6 putting the design together and selecting materials of

7 construction, and in this case we do see a conflict.

8 The architect did select concrete and he also selected a

9 PVC deck.

10    Q.    Okay.  We're not -- I appreciate that, but I'm

11 not going into the conflict.  We've already talked about

12 that.

13        But back to the original question.  The

14 architect could have, in your opinion, designed the

15 Willow Creek Apartments to meet this higher WUI standard

16 that you have articulated since the Willow Creek

17 Apartments are in this SRA and rural area, correct?

18    A.    Correct.

19    Q.    Okay.  The architect did not, to your

20 knowledge, do that, correct?

21    A.    In some cases they did.  Again, the concrete

22 deck is indicated in the architectural and structural

23 plans.

24    Q.    In some places there are areas that, by

25 happenstance, coincide with your version of the WUI



1  standard; but there isn't any definitive statement
2  anywhere, in this case, that the architect said, "Here
3  is the WUI standard that we have to meet.  We're going
4  to use higher-rated fire materials on 25 extra things,"
5  right?
6      A.   There's -- correct.
7      Q.   All right.  For example, fire sprinklers, were
8  those required to be on the ceiling above the green
9  deck?
10     A.   I don't know as I sit here.
11     Q.   Do you know if there were fire sprinklers on
12 the ceiling above the green deck?
13     A.   I don't believe so.
14     Q.   You believe there were not fire sprinklers,
15 right?
16     A.   Correct.
17     Q.   So if we pore through the pages of the various
18 WUI codes and other codes there might be something
19 somewhere that says in a rural place you ought to have
20 an extra set of fire sprinklers, right?
21     A.   I don't know.
22     Q.   You don't know, okay.  And in your expert
23 report, you do not fault the architect for not adhering
24 explicitly and expressly to your version of the WUI
25 standard in constructing this Willow Creek apartment



```
1              CERTIFICATE OF REPORTER

2          I, MICHELLE L. ARCHULETTA, a Shorthand

3  Reporter, State of California, do hereby certify that

4  the witness in the foregoing deposition was present and

5  by me sworn as a witness in the above-entitled action at

6  the time and place therein specified;

7          That said deposition was taken before me at

8  said time and place, and was taken down in shorthand by

9  me, a Certified Shorthand Reporter of the State of

10 California, and was thereafter transcribed into

11 typewriting, and that the foregoing transcript

12 constitutes a full, true, and correct report of said

13 deposition and of the proceedings that took place;

14         That before completion of the proceedings,

15 the witness has requested review pursuant to Rule

16 30(e)(2).

17

18         IN WITNESS WHEREOF, I have subscribed my name.

19

20         DATED:  January 20, 2017.

21

22                                Michelle L. Archuletta
                                  _____
23                                MICHELLE L. ARCHULETTA
                                  CSR No. 11028

24

25
```



```
 1                DEPOSITION ERRATA SHEET
 2
 3   Job No. J0499701
 4   Philadelphia Indemnity Insurance
 5   vs.
 6   Danco Builders
 7
 8            DECLARATION UNDER PENALTY OF PERJURY
 9       I declare under penalty of perjury that I have read
10   the entire transcript of my Deposition taken in the
11   captioned matter or the same has been read to me, and
12   the same is true and accurate, save and except for
13   changes and/or corrections, if any, as indicated by me
14   on the DEPOSITION ERRATA SHEET hereof, with the
15   understanding that I offer these changes as if still
16   under oath.
17       Signed on the _____ day of _____,
18   20___.
19
20       _____
21                JEFF HUGHES
22
23
24
25
```



# EXHIBIT 8



**LES KELLEY** INC
GENERAL CONTRACTORS
CONSTRUCTION CONSULTANTS

**PHILADELPHIA INDEMNITY v. DANCO BUILDERS**
**United States District Court,**
**Northern California**
**Case No. 14-cv-03945-WHO**

1.  <u>INTRODUCTION:</u>

I am Patrick E. Kelley and the author of this report and commentary. I am a graduate of Stanford
University. I received a Bachelor of Science degree and a Master of Science degree in Civil
Engineering in 1972 from Stanford. I also earned a Master of Business Administration degree from
the Stanford Graduate School of Business in 1974. I am a licensed general contractor in the state
of California (classifications held: A Engineering Contractor and B General Building Contractor). I
have worked full time in the construction industry since 1974. I am currently president and owner
of Les Kelley, Inc., a general contracting and construction consulting firm located in Belmont,
California. Since 1988 , I have qualified as an expert in the field of construction/civil engineering in
at least 30 trials and more than 200 depositions, in both state and federal court.  Attached as
Exhibit 1 is my current CV and fee schedule. Attached as Exhibit 2 is a list of my prior trial and
deposition testimony of the past 5 years. I am a member of the American Society of Civil
Engineers and the Associated General Contractors.

I have not authored any publications in the past 5 years.


My work experience in the construction industry includes work as a laborer, apprentice,
carpenter, foreman, project manager, vice president and president of my firm. Some of the
projects my firm has constructed include the following:

*   **Redwood City, California Post Office**
*   **Belmont, California Post Office**
*   **Brisbane, California Fire Department Headquarters Building**
*   **747 Terminal (Pier F) San Francisco International Airport**
*   **San Mateo, California Public Library**
*   **Remodel of Mudd Chemistry Building, Stanford University**
*   **Remodel of Physics Building, Stanford University**
*   **MRI Center, University of California, San Francisco**
*   **MRI Center, Mills-Peninsula Hospitals**
*   **MRI Center, Stanford University**

In addition to the above work, my firm has constructed single family residences, multi-family
residences and has extensive experience in the repair and re-construction of fire and water
damaged buildings.

My assignment was to determine what role, if any, Danco Builder's actions or inactions caused or
contributed to the fire on December 16, 2013 to the Willow Creek Apartments and whether Danco

503 Dale View Ave.
Post Office Box 340
Belmont, CA 94002
650.591.2624
Fax  650.591.2689



acted as a reasonable general contractor within the applicable standard of care. I have prepared this report in accordance with Rule 26(a)(2), of the Federal Rules of Civil Procedure. The opinions and conclusions and bases for my opinions and conclusions expressed below are made on a more likely than not basis, to a reasonable degree of certainty in the field of construction and engineering. As expressed below, in my opinion, Danco Builders did not act negligently as its actions and in actions did not fall below the standard of care for general contractors in offering the Procell (or equivalent) decking as an alternate to the Ultra Guard product and having it approved by the building official for use in the project, principally because its fire spread index was Class "C" and met the standards in force at the time.

2. BACKGROUND:

Danco Builders, a licensed California general contractor (California license number 500851), was retained as the general contractor to construct a twenty-four unit apartment complex in Willow Creek, California known as the Willow Creek Apartments. The construction of the apartment complex took place in the 2006-2007 time period. Subsequent to the completion of the project, in 2013 there was a fire at the Willow Creek Apartments that involved a number of the apartment units as well as an exterior deck. The Plaintiff in this action is alleging that the composite decking product that was used on the project did not conform to the approved project drawings or to the applicable building code in force at the time and that the decking had an unacceptable flame spread rating that contributed to the over-all damage to the complex.

3. SCOPE OF ASSIGNMENT:

My assignment was to determine what role, if any, Danco Builder's actions or inactions caused or contributed to the fire on December 16, 2013 to the Willow Creek Apartments and whether Danco acted as a reasonable general contractor within the applicable standard of care.

4. DOCUMENTS REVIEWED:

- 2001 California Building Code
- 2007 California Building Code
- 2013 California Building Code
- Project Drawings (may not be a complete set)
- Procell ESR 1667 Report dated December 1, 2006
- ASTM E 84 testing protocol
- Various fire tests conducted on behalf of the Plaintiff
- APA Technical Bulletin TT-010B
- Approved Procell decking submittal dated September 26, 2006
- Danco Job File
- Deposition Transcripts of Richard Joseph and Cory Hicks
- Fire Investigation Report, December 2013 by Cory Hicks
- MEI Report
- WEXCO Notes

5. OPINIONS AND OBSERVATIONS:



<u>California Building Code:</u> Traditionally, the California Building Code (CBC) which governed the construction of buildings in the State of California in the 2006-2007 time frame, is published every three years on January 1. Six months after publication, the CBC becomes the de facto code governing all construction within the State of California whether it is adopted by subordinate jurisdictions or not. A CBC was published in the year 2001 and became the building code within the State of California in that year. The next publication for the CBC would have been in the year 2004. In 2003 the International Building Code (IBC) had been published and had been adopted by other out of state jurisdictions in 2003. However, the State of California did not adopt the IBC at that time and continued to use the 2001 CBC into 2007. The State of California did not publish a 2004 CBC on the normal three year anniversary. Therefore, the 2001 CBC was the governing building code in the 2006-2007 time frame in which the subject project was permitted and constructed.

<u>Approved Plans:</u> The project drawings were submitted and approved by the Humboldt County, Building Inspection Department. On the approved plans is the following information regarding the vinyl decking product:

"Ultra Guard vinyl decking system to conform to ASTM D 3679, CGS3 (3-GP-24 Ma), CCMC Report No. 06405, ICBO Report No. 3887, BOCA Report No. 90-60."

The Ultra Guard decking system was manufactured by Associated Material Inc. AMI no longer makes the vinyl decking system but continues to market a vinyl railing and fencing systems under the Ultra Guard name.

<u>Section 106.4.1 Issuance</u> of the 2001 CBC reads in part "When the building official issues a permit where plans are required, the building official shall endorse the plans and specifications APPROVED. Such approved plans and specifications shall not be changed, modifies or altered without authorization from the building official, and all work regulated by this code shall be done in accordance with the approved plans." Therefore, unless the plans and specifications were "changed, modified or altered" <u>with</u> the permission of the building official, the requirement to use the Ultra Guard decking system was mandatory.

<u>Substitution of Decking Material:</u> It is clear that at some point, the request was made to substitute the Procell vinyl decking system for the Ultra Guard decking system specified in the project drawings and specifications. Custom and practice in the industry is for the general contractor to submit to the architect of record the proposed substitution. The architect then reviews the requested substitution and either approves the substitution as meeting the design intent or rejects it. Once approved, the substituted item becomes part of the project drawings and specifications.

<u>Procell Decking: The Product:</u> The Procell decking system was manufactured by Procell Decking Inc. in Foley, Alabama. The company was founded in 2004. Procell was purchased by Azek Deck sometime in 2007 and the Procell decking system was absorbed into the Azek company brand. The decking system itself is based upon a vinyl poly-resin fiber material. It is a composite and is definitely not a natural product such as redwood or western red cedar.

In order for a product to be used and incorporated into a building, it must have an ICC Evaluation Report. This is a requirement of the 2001 CBC and all subsequent codes. An ICC report was issued for the Procell decking (ESR-1667) dated December 1, 2006. In checking with ICC Evaluations Services Inc., this report was the first and only report issued to Procell before its acquisition by Azek in 2007. While the report is dated December 1, 2006, it is based upon data provided in June 2006 so this report is contemporaneous with Willow Creek Apartment project.



Under Section 2.0 Uses: of the ESR report, the Procell decking system is approved for "exterior use as deck boards for exterior balconies, porches, decks and stair treads...". The Procell decking was used as exterior decking material at the subject project.

Under Section 3.1 General: of the ESR report, the Procell decking has a flame-spread index of no greater than 200 as determined by ASTM E 84 testing protocol. Therefore, the Procell decking system has at least a Class C fire rating. It should be noted that 2x redwood and 2x western cedar also have a Class C fire rating when used in the same decking application as Procell.

Alternate Materials: Section 104.2.8 Alternate for Materials, Design, Tests and Methods of Construction of the 2001 CBC reads as follows: "The provisions of this code are not intended to prevent the use of any material, alternate design or method of construction not specifically prescribed by this code, provided any alternate has been approved and its use authorized by the building official. The building official may approve any such alternate, provided the building official finds that the proposed design is satisfactory and complies with the provisions of this code and that the material, method or work offered is, for the purpose intended, at least the equivalent of that prescribed in this code in suitability, strength, effectiveness, fire resistance, durability, safety and sanitation. The building official shall require that sufficient evidence or proof of submitted to substantiate any claims that may be made regarding its use. The details of any action granting approval of an alternate shall be recorded and entered in the files of the code enforcement agency."

It is clear from this provision of the CBC that the building official has the authority to approve alternate materials provided he finds among other things that the material is at least equivalent to the replaced material in "fire resistance."

Deferred Submittals: Section 106.3.4.2 Deferred Submittals of the 2001 CBC reads as follows: "For the purposes of this section, deferred submittals are defined as those portions of the design that are not submitted at the time of the application and that are to be submitted to the building official within a specified period.

Deferral of any submittal items shall have prior approval of the building official. The architect or engineer of record shall list the deferred submittals on the plans and shall submit the deferred submittal documents for review by the building official.

Submittal documents for deferred submittal items shall be submitted to the architect or engineer of record who shall review them and forward them to the building official with a notation indicating that the deferred submittal documents have been reviewed and that they have been found to be in general conformance with the design of the building. The deferred submittal items shall not be installed until their design and submittal documents have been approved by the building official."

There clearly is a mechanism in the 2001 CBC for submittals after the fact (i.e. after the original plans and specifications have been submitted to the building official for approval and issuance of a permit). In fact, such a submittal was made to the Humboldt County, Building Inspection Department for the Procell decking system and it was approved by the building official on September 26, 2006. This approval then altered the approved plans and specifications by substituting the Procell product for the Ultra Guard decking material originally specified.



We have contacted Ultra Guard and learned that they no longer make vinyl based exterior decking. In fact, Ultra Guard informed us that in the 2006-2007 time frame, the Ultra Guard decking product was no longer being manufactured. It is therefore likely that the request to substitute the Procell decking for the Ultra Guard product was prompted by the unavailability of the Ultra Guard decking.

Fire Tests Conducted by Plaintiff: The Plaintiff has conducted fire tests on samples taken from the Willow Creek Apartment project. The tests conducted on the samples were 1.) Under Deck Test (Part A) 2.) Burning Brand Test (Part B, Class B) and 3.) ASTM Test Designation E84-15b. The Plaintiff cites requirements of the 2013 California Building Code, Chapter 7A (CSFM 12-7A-4) as relevance of these tests. As noted above, the 2001 edition of the California Building Code applies to the Willow Creek project so the 2013 CBC does not apply in this matter. Chapter 7A was not in the 2001 CBC and did not appear in any form until the 2007 CBC. As such, the Under Deck Test and the Burning Brand test as cited in Chapter 7A do not apply to the Willow Creek project.

Of relevance to Willow Creek is the ASTM E84-15b test. The test conducted by Plaintiff demonstrated a flame spread of 150 and a smoke development of 25. This gives the decking material a Class C fire rating. This is consistent with the contemporary ESR report which required a flame spread of less than 200 which the tested sample met.

Finally, there is some question as to whether or not the sample taken from the project is a Procell product. In our view, this is not an issue as the fire rating of the tested sample, which is the only relevant issue, is the same as for the Procell product per its ESR report.

Decking Material: Vinyl v. Concrete: Plaintiff has raised an issue regarding the decking material itself on the subject balcony deck. Review of the Approved drawings reveals the following:

- On Sheet A5.1, the 2nd Floor Plan is depicted. A section line through the balcony deck refers to Detail C on Sheet A5.2.
- On Sheet A5.2, Detail C (Section C-C) refers to further Detail D on Sheet A6.1, Wall Section.
- On Sheet A6.1, Detail D, Wall Section, clearly depicts the balcony decking material to be Ultraguard PVC decking.
- On Sheet S4.2, the 2nd floor framing is depicted. A section line through the balcony deck refers to Detail 6 on Sheet S6.2.
- On Sheet S6.2, Detail 6 depicts 2" of concrete topping over floor sheathing (unspecified).

This is a classic example of the failure of the architect of record to properly integrate the structural drawings with the architectural drawings. With that said, the structural engineer has calculated the loads (the governing factor for the structural design) for concrete on the balcony decks. In fact, a lighter PVC decking was installed in lieu of concrete, so the structural design has not been compromised. The PVC decking is consistent with the architectural details and the architectural details govern in this instance. Further the use of PVC decking was reviewed and approved (including a change in the brand of the PVC decking) by the Humboldt County Building Inspection Department.

Use of OSB v. Plywood: The Plaintiff asserts that OSB was inappropriately substituted for plywood for the exterior wall sheathing. On the structural drawing S6.5, under Wood Shear Wall Notes #7, it states that "Oriented Strand Board may be substituted for structural II plywood." Further substitution of OSB for plywood does not compromise the fire resistivity of the structure as both materials have a flame spread within the Class C fire rating (see APA Technical Bulletin TT-010B). The use of OSB in the project is consistent with the design intent.



<u>Observations and Conclusion:</u> Danco Builders was the general contractor of record for the Willow Creek Apartments project. Danco's task was to implement and build the design of the project's architect of record. Danco was not responsible for the design of the project.

The Ultra Guard decking system was no longer being manufactured in the 2006-2007 period. It seems likely that the Procell product was offered as a substitute for that reason. Danco likely submitted the Procell product for consideration to the architect who then submitted the product under a deferred submittal to the Humboldt County, Building Inspection Department. The Procell product was reviewed and approved by the building official on September 25, 2006.

The Procell product has an ICC Evaluation Service, Inc. report (ESR-1667) that certifies the product for use as exterior decking and thus conforms to the requirement of the 2001 CBC for such products. Further, the Procell product has a Class C fire rating (flame spread index less than 200) equal to 2x redwood or western red cedar when used as decking material. If the Procell product did not meet the design intent for the project, the architect would have been required to reject it as an alternate. Similarly, if the Procell product did not meet the requirements of the 2001 CBC, the building official would have been required to reject the product as an alternate to the original design.

However, the Procell product was not rejected but was approved for use as exterior decking. Once approved through a deferred submittal process, it became part of the APPROVED plans.

The Plaintiff asserts that the actual decking material may not be the Procell product at all. However, the sample deck product that was tested by the Plaintiff has the same Class C fire rating as the Procell product. Therefore, even if the product used is one different than the Procell product itself, the actual product used is equivalent in its fire resistivity.

I do not believe Danco acted negligently or fell below the standard of care for general contractors in offering the Procell (or equivalent) product as an alternate to the Ultra Guard product and having it approved by the building official for use in the project.



**Observations and Conclusion:** Danco Builders was the general contractor of record for the Willow Creek Apartments project. Danco's task was to implement and build the design of the project's architect of record. Danco was not responsible for the design of the project.

The Ultra Guard decking system was no longer being manufactured in the 2006-2007 period. It seems likely that the Procell product was offered as a substitute for that reason. Danco likely submitted the Procell product for consideration to the architect who then submitted the product under a deferred submittal to the Humboldt County, Building Inspection Department. The Procell product was reviewed and approved by the building official on September 25, 2006.

The Procell product has an ICC Evaluation Service, Inc. report (ESR-1667) that certifies the product for use as exterior decking and thus conforms to the requirement of the 2001 CBC for such products. Further, the Procell product has a Class C fire rating (flame spread index less than 200) equal to 2x redwood or western red cedar when used as decking material. If the Procell product did not meet the design intent for the project, the architect would have been required to reject it as an alternate. Similarly, if the Procell product did not meet the requirements of the 2001 CBC, the building official would have been required to reject the product as an alternate to the original design.

However, the Procell product was not rejected but was approved for use as exterior decking. Once approved through a deferred submittal process, it became part of the APPROVED plans.

The Plaintiff asserts that the actual decking material may not be the Procell product at all. However, the sample deck product that was tested by the Plaintiff has the same Class C fire rating as the Procell product. Therefore, even if the product used is one different than the Procell product itself, the actual product used is equivalent in its fire resistivity.

I do not believe Danco acted negligently or fell below the standard of care for general contractors in offering the Procell (or equivalent) product as an alternate to the Ultra Guard product and having it approved by the building official for use in the project.

_David E. Kelly_   9. 22 . 16

# EXHIBIT 9

```
1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3

4    PHILADELPHIA INDEMNITY        )
                                   )
5    INSURANCE COMPANY,            )
                                   )
6            PLAINTIFF,            )
                                   )
7        vs.                       )   No.  15-CV-03945-WHO
                                   )
8    DANCO BUILDERS, DOES 1 TO 10,)
                                   )
9    INCLUSIVE,                    )
                                   )
10                                 )
            DEFENDANTS.            )
11   _____)

12   DEPOSITION OF:   PATRICK E. KELLEY

13   DATE:            Wednesday, January 11, 2017

14   LOCATION:        1300 Clay Street
                      Suite 600
15                    Oakland, CA 94612

16   REPORTED BY:     KATHLEEN WILKINS, CSR #10068

17

18

19

20

21

22

23

24

25
```

PHILADELPHIA INDEMNITY vs DANCO BUILDERS                    01/11/2017
Kelley, Patrick                                                        2

1              DEPOSITION OF PATRICK E. KELLEY

2                  BE IT REMEMBERED that on Wednesday,

3      January 11, 2017, commencing at the hour of

4      10:02 a.m. thereof, at Yaron & Associates, 1300

5      Clay Street, Suite 600, Oakland, California,

6      before me, Kathleen A. Wilkins,

7      RPR-RMR-CRR-CCRR-CLR, a Certified Shorthand

8      Reporter, in and for the State of California,

9      personally appeared PATRICK E. KELLEY, a witness

10     in the above-entitled court and cause, who, being

11     by me first duly sworn, was thereupon examined as

12     a witness in said action.

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Residential Code and the International Building

2  Code.

3      Q.    Did you -- are you familiar enough with

4  the International Fire Code's model Urban-Wildland

5  Interface Code to form an opinion on it?

6      A.    No, I'm not.

7      Q.    Okay.  Fair to say you've never worked

8  on a project where the Urban-Wildland Interface

9  Code was addressed?

10     A.    I can't say that, because from a general

11 contractor's standpoint, the addressing of code

12 issues is the responsibility of the designer,

13 whether it's a structural engineer or the

14 architect of record.  They do their research and

15 determine how a code may or may not apply.

16         For a general contractor, it's generally

17 the California Building Code.  At least it was at

18 this time that we're talking about, this

19 particular building built 2006-2007 time frame.

20     Q.    So fair to say that your -- do you have

21 an opinion on whether or not the Urban-Wildland

22 Interface Code was a standard of care for the

23 general contractor in this case, or do you not

24 have enough information to know whether it is?

25     A.    My opinion is it was not a standard of

```
1    care.  The standard of care at the time this

2    building was built, this particular project, it

3    was the California Building Code, which was what

4    governed the standard of care at that time.

5            The WUI code was a model code that was

6    promulgated by interested citizens and experts

7    saying we ought to consider this.  But it

8    wasn't -- it wasn't codified.  It wasn't part of

9    the requirements.  So then Humboldt County at the

10   time, and later the California Department of

11   Forestry and the California Fire Marshal, took

12   elements of the WUI code and codified them and

13   then made them part of the California Building

14   Code through a supplement called Chapter 7A.

15       Q.    And that became effective 1/1/08?

16       A.    Part of it did.  Part of it became

17   earlier than that.  It actually -- part of it, in

18   dealing with roofs and soffits, I think it was

19   sometime in 2005, if I'm not mistaken.  But with

20   regard to deck material, it was January 1st,

21   2011, after this building was permitted and

22   essentially completed.

23       Q.    Do you have any opinions on what types

24   of information and building materials was being

25   discussed by the industry prior to the State Fire
```

```
 1              MR. STEELE:   I'll have -- obviously I'll

 2   have a copy.

 3              MR. COLE:   Same.

 4              (Whereupon, the deposition concluded

 5        at 2:17 p.m.)

 6              I declare under penalty of perjury the

 7   foregoing is true and correct.   Subscribed at

 8   _____, California, this

 9   ____day of_____, 2017.

10

11

12              _____

13              PATRICK E. KELLEY

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    CERTIFICATE OF REPORTER

 2

 3              I, KATHLEEN A. WILKINS,

 4      RPR-RMR-CRR-CCRR-CLR, Certified Shorthand

 5      Reporter, hereby certify that the witness in the

 6      foregoing deposition was by me duly sworn to tell

 7      the truth, the whole truth and nothing but the

 8      truth in the within-entitled cause; that said

 9      deposition was taken down in shorthand by me, a

10      disinterested person, at the time and place

11      therein stated, and that the testimony of the said

12      witness was thereafter reduced to typewriting, by

13      computer, under my direction and supervision.

14              I further certify that I am not of

15      counsel or attorney for either or any of the

16      parties to the said deposition, nor in any way

17      interested in the event of this cause, and that I

18      am not related to any of the parties thereto.

19

20              DATED: January 24              , 2017

21

22

23      Kathleen Wilkins

24      KATHLEEN WILKINS, RPR-RMR-CRR-CCRR-CLR, CSR 10068

25
```

# EXHIBIT 10



GENERAL CONTRACTORS
CONSTRUCTION CONSULTANTS

PHILADELPHIA INDEMNITY v. DANCO BUILDERS
United States District Court,
Northern California
Case No. 14-cv-03945-WHO

## 1. Supplemental Report:

This report is intended to supplement the report previously submitted by me in this matter. This report is being submitted at this time in order to comment upon additional material I subsequently reviewed.

## 2. Supplemental Documents:

I reviewed the following supplemental documents:

- 2001 California Building Code Chapter 7A Emergency Supplement dated December 1, 2005.
- 2001 California Building Code Chapter 7A Emergency Supplement dated June 21, 2006.
- Finding of Emergency by the California Department of Forestry (CDF) and Fire Protection Office of the State Fire Marshall (SFM) to the California Code of Regulations, Title 24, California Building Code (CBC), Part 2 and the California Referenced Standards Code (CRSC), Part 12 Regarding Phase II- Wildland-Urban Interface Fire Areas Building Standards dated August 2005.
- Emergency Express Terms by the California Department of Forestry (CDF) and Fire Protection Office of the State Fire Marshall (SFM) to the California Code of regulations, Title 24 California Building Code (CBC) Part 2 and the California Referenced Standards Code (CRSC), Part 12 Regarding Phase II- Wildland-Urban Interface Fire area building Standards dated August 2005.

## 3. Comments and Observations:

With the emergency provisions cited above, the 2001 CBC was amended with Chapter 7A. Four areas of concern were cited within these provisions with regard to the design, permitting and construction of new structures within a designated Wildland-Urban Interface Zone. Those areas so addressed are Roofs, Attic Ventilation, Exterior Walls and Decking. The provisions affecting Roofs and Attic Ventilation (Sections 704A.1 and 704A.2 respectively) are to be implemented with the application for a building permit for a new building after December 1, 2005 (see Section 701A.3 Application).

Similarly, the provisions affecting Exterior Walls and Decks (sections 704A.3 and 704A.4

503 Dale View Ave.
Post Office Box 340
Belmont, CA 94002
650.591.2624
Fax 650.591.2689



respectively) come under the jurisdiction of this emergency supplement when applying for a permit for a new building in an Wildland-Urban Interface Zone but <u>not until January 1, 2008</u> (emphasis added) (see Section 701A.3.2 <u>New Buildings Located in any Fire Hazard Severity Zone</u>). The provisions basically require that Exterior Walls and Decks be constructed of Ignition Resistant Materials.

<u>The Willow Creek Apartments were approved for construction by the Humboldt County, Building Department on September 25, 2006 so would not be subject to these emergency supplement provisions for Exterior Walls and Decks at the time of permitting.</u>

*David E. Kelly* 10·20·16

# EXHIBIT 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

PHILADELPHIA INDEMNITY          )
INSURANCE COMPANY,              )
                               )
                Plaintiff,      ) Case No.
                               ) 3:15-cv-03945-WHO
        vs.                     )
                               )
DANCO BUILDERS, DOES 1 to 10    )
Inclusive,                      )
                               )
                Defendants.     )
_____ )


EXPERT DEPOSITION OF

LARRY PELTON


January 09, 2017

9:42 a.m.


1300 Clay Street, Suite 800

Oakland, California


Reported by:  Michelle L. Archuletta, CSR No. 11028



1       A.    Yes.

2       Q.    When you say the vinyl -- I'm sorry -- "The box

3   was up against the vinyl siding," are you saying -- you

4   are saying that the cardboard box, the second source of

5   fuel was adjacent to that north wall on the deck,

6   correct?

7       A.    That's correct.  Adjacent to it.  I don't know

8   if it was touching, but I believe it was within an inch

9   or two.

10      Q.    Fair enough.  You say that you usually get

11  approximately 30 percent more heat release towards the

12  ceiling, and what do you mean by that?

13      A.    If a fire is burning against a wall or in a

14  corner versus in the center of a room, the heat is going

15  to -- instead of -- if it was in, say, the middle of the

16  deck, the heat is going to be dissipated on all sides,

17  okay?  If it's up against something that's blocking it,

18  the heat is going to hit that and then rise up quicker

19  than it would if it had dissipated out.

20      Q.    And in this case, the 30 percent increase in

21  heat release was directly towards the, what we've called

22  the northwest wall, which had vinyl siding on the

23  exterior, correct?

24      A.    Yes.

25      Q.    All right.  And what was the consequence of



1  that approximately 30 percent increase in heat release

2  towards the vinyl siding?

3     A.    Just gets the heat to the vinyl soffit quicker

4  than it would have if the fire had been in the middle of

5  the deck.

6     Q.    Did that cause the vinyl siding to melt quicker

7  than it otherwise would have?

8     A.    I don't know.

9     Q.    Okay.

10    A.    If -- you know, it being closer to the actual

11 ignition source, if that's what you mean, yes.  If --

12 than versus being in the middle of the deck, yeah, the

13 siding would have taken longer to ignite if it had

14 been -- the fire had been in the middle of the deck with

15 a sizable airspace between the actual fire initially and

16 the siding.

17    Q.    Okay.  Now, I want to turn to page 60 of your

18 deposition transcript, and this is line 10:

19           "Question:  All right.  Did the fire

20             from the cardboard box and the paper

21             bag, did that ignite the siding on that

22             north wall?

23           "Answer:  I have no way of knowing if

24             that actually ignited the siding or

25             when it got to the deck and the heat



1  to meet the California Building Code at issue -- or

2  governing at the time Willow Creek Apartments was

3  constructed; is that true?

4      A.   If we're just specifically talking about the

5  California Building Code and not the Urban Interface

6  Code for wildland safety or fire safety there, then I

7  don't know.

8      Q.   We're just talking about the California

9  Building Code.

10     A.   Okay.

11     Q.   You know what the California Building Code is,

12  right?

13     A.   Yes.

14     Q.   What's the California Building Code?

15     A.   It's a standard that is to be met when you're

16  building -- doing construction in California.

17     Q.   It's the law basically, right?

18     A.   Yes.

19     Q.   All right.  And, hypothetically, if the

20  California Building Code permitted decking to be Class C

21  at the time Willow Creek Apartments was constructed,

22  then the green deck would have satisfied the California

23  Building Code, correct?

24     A.   Correct.

25     Q.   Now, we talked about -- strike that.



1      A.    That's correct.

2      Q.    All right.  Let's just talk about the Ultra

3   Guard.  Was that a vinyl deck?

4      A.    It was a plastic composite.  I don't remember

5   if it was vinyl or what it was made of.

6      Q.    Is Ultra Guard a brand name, to your knowledge?

7      A.    Yes.

8      Q.    Have you ever investigated the flame spread

9   characteristics of an Ultra Guard deck?

10     A.    I've never investigated the flame

11  characteristics of it, no.

12     Q.    Have you ever come across an Ultra Guard deck

13  in any of the 400 or so fires that you've investigated?

14     A.    Not that I'm aware.

15     Q.    Are you generally familiar with that product,

16  an Ultra Guard vinyl deck?

17     A.    No.

18     Q.    Do you have an opinion as to whether or not --

19  strike that.

20        As you sit here right now, you don't know if

21  the Ultra Guard vinyl deck that was specified in the

22  plans has a Class A or a Class B or a Class C

23  classification for flame spread, correct?

24     A.    I don't recall what the flame spread is.  I

25  believe I've seen some documentation on it.  I don't



1   recall what it is right now.

2       Q.   So my question is correct then?

3       A.   As I sit here today, I don't remember what the

4   flame spread would be on it.

5       Q.   So you don't have an opinion as to whether or

6   not the green deck that was actually installed at Willow

7   Creek has a better or worse classification than the

8   Ultra Guard deck that was specified in the plans; is

9   that correct?

10      A.   Alls I recall is that the green decking

11  material is -- how do you say? -- I was going to say

12  worse in the flame spread than the Ultra Guard.  I

13  don't -- like I'm trying to say, I don't remember what

14  the Ultra Guard is.  I just know that Ultra Guard was a

15  better product than the green deck board.

16      Q.   Is that written in your report anywhere,

17  Exhibit 5, that the Ultra Guard was a, quote, better

18  product than the green deck?

19      A.   No, because that wasn't my -- my goal at the

20  time is to write the report of what caused the fire and

21  what contributed to the spread.  Not what products

22  should have been used.

23      Q.   Okay.  But when you say "better," you're not

24  quantifying better as when comparing the green deck to

25  the Ultra Guard vinyl deck, correct?



1      A.    I don't know what you mean by that.

2      Q.    Bad question.  I'll withdraw it.

3            You don't know whether the Ultra Guard deck

4  that was specified in the plans has a Class A, Class B,

5  or Class C fire rating, according to the California

6  Building Code, correct?

7      A.    Sitting here today, I don't recall.

8      Q.    All right.  Fair enough.  So it could be the

9  case that the Ultra Guard vinyl deck has a Class C fire

10  rating and the green deck that was actually used also

11  has a Class C fire rating, correct?

12      A.    As I sit here today, yes, it could be.

13      Q.    Now, there is mentioned in the plans, in the

14  structural section of the plans of a light concrete

15  deck.

16            You recall that, right?

17      A.    Yes.

18      Q.    And do you have an opinion as to whether or not

19  Danco was negligent in not using a light concrete deck

20  as opposed to the actual green deck that was used?

21      A.    I don't believe it's up to me to determine who

22  is negligent.

23      Q.    Okay.  In your opinion, if Danco had used the

24  light concrete deck as opposed to the green deck, would

25  that have changed the fire spread and the fire damage at



1   the Willow Creek Apartments?

2       A.    Yes.

3       Q.    How so?

4       A.    The -- obviously the decking material would not

5   have contributed to the fire intensity and spread.    It

6   would have -- the cardboard box, I believe, eventually

7   would have ignited the siding and then the craft paper,

8   construction paper underneath, and then the OSB

9   underneath that, and spread up the wall into the attic

10  through the vinyl soffit and then into the attic area.

11      Q.    Do you have any opinion on how much slower or

12  quicker the process you just described would have

13  happened had, hypothetically, light concrete deck had

14  been used instead of the green deck?

15      A.    The process would have been much slower than it

16  was.

17      Q.    When you say "much slower," you don't have an

18  opinion as to how long, right?

19      A.    No.   I just know it would have been a much

20  smaller fire initially.

21      Q.    Okay.   But you don't have an opinion as to the

22  difference or the delta between times?

23      A.    Are you talking the time frame?

24      Q.    Sure.

25      A.    It's too hard to quantify, because I don't know



1  when the fire would have been noticed, because without

2  the plastic vinyl decking burning, I don't know what the

3  smoke would have been produced to be able to -- you

4  know, how long it would have had to have burned before

5  somebody noticed the fire.  I can't quantify a time

6  there since it's something that didn't happen, so...

7      Q.   The bottom line is you cannot quantify a time

8  difference had a light concrete deck been used as

9  opposed to the green deck, correct?

10     A.   Not a time period besides much slower

11  progression of the fire.

12          MR. STEELE:  Let's mark the next exhibit in

13  order, 7.

14            (Exhibit 7 marked)

15  BY MR. STEELE:

16     Q.   Mr. Pelton, I'm showing you Exhibit 7.  It's a

17  pamphlet titled Procell Decking Systems.

18          Do you see that?

19     A.   Yes.

20     Q.   It's stamped Approved by the Humboldt County

21  Building Inspection Department, September 25, 2006; is

22  that right?

23     A.   That's correct.

24     Q.   And then it says the plans reviewed by

25  Precision Inspection, I think that says Company or



1   that the fire -- Captain Hicks believed it started in a

2   plant on top of an object.  It's obvious that that

3   object that the plant was on did not ignite, so that's

4   an additional fuel source.

5          The low fuel source here, obviously, ignited

6   the siding, but did not burn as intensely as the fire

7   that we had in the 2013.

8      Q.   It also didn't -- the 2008 fire did not burn as

9   long as the fire in 2013, correct?

10     A.   Overall fire, no.

11     Q.   And the 2008 fire was originated by another

12  cigarette that was improperly disposed; is that correct?

13     A.   That's Captain Hicks' opinion.

14     Q.   Do you agree with that opinion?

15     A.   I have no knowledge of yes or no.

16     Q.   Okay.  Fair enough.  So the -- strike that.

17          The other issue that you disagree with

18  Dr. Cuzzillo is late ignition of the deck, correct?

19     A.   That's correct.

20     Q.   What is your disagreement on that particular

21  issue?

22     A.   I believe it ignited once the cardboard box

23  ignited.  After the cardboard box burned down, it would

24  have ignited the deck, not the drop down from the attic.

25     Q.   Okay.  And what's your basis for that opinion?



1    A.    The patterns.

2    Q.    Which pattern?

3    A.    The rectangular pattern on the deck underneath

4  where the cardboard box was located that burned through

5  the decking there.

6    Q.    Besides that rectangular pattern on the deck

7  where it burned through, are there any other bases for

8  this opinion that you have?

9    A.    I don't know if I follow the question.

10    Q.    Sure.  You gave me your opinion that the green

11  deck ignited earlier rather than later, correct?

12    A.    Correct.

13    Q.    You said one of the bases was that the pattern,

14  the rectangular pattern on the green deck where it

15  burned through, correct?

16    A.    Yes.

17    Q.    That's at the northwest hole, right?

18    A.    Yes.

19    Q.    And I asked whether you have any other bases to

20  support that opinion.

21    A.    My knowledge of how fire burns.

22    Q.    And explain to me what's that knowledge of how

23  fire burns.

24    A.    Once that product is ignited, say the paper bag

25  initially is ignited, it burns, it drops down, it



1       A.   I don't have any with me, but it's in my
2  training and observations of fire.
3       Q.   Is that some hard-and-fast rule?
4       A.   There is documentation to that, yes.
5       Q.   And what -- is that in the NFPA fire
6  investigation guidelines, 921, I guess.
7       A.   Yeah, there's documentation in 921 that talks
8  about fires on horizontal surfaces versus vertical
9  surfaces, yes.
10      Q.   What does that say?  What does it say about
11 horizontal surfaces?
12      A.   It's going to burn at a slower rate.  It will
13 travel at a slower rate on a horizontal surface.  Spread
14 out on a horizontal surface slower than it's going to
15 be on -- than it would be, like I said before, against a
16 wall.
17      Q.   How slow of a rate, if you know?
18      A.   I don't know.
19      Q.   And you don't make that determination in your
20 expert report, Exhibit 5, the rate of horizontal burning
21 of the deck, right?
22      A.   No, I don't.
23      Q.   That's correct?
24      A.   That's correct.
25      Q.   Let's talk a little bit about the WUI standard.



1   We talked about that earlier.  You know what WUI means,

2   right?

3        A.   The Urban Interface?

4        Q.   Yes.

5        A.   Yes.

6             MR. STEELE:  Let's mark this as exhibit next in

7   order.

8             (Exhibit 13 marked)

9   BY MR. STEELE:

10       Q.   You have Exhibit 13 in front of you,

11  Mr. Pelton?

12       A.   Yes.

13       Q.   This is a document entitled, "International

14  Urban-Wildland Interface Code, 2003."

15            Do you see that?

16       A.   Yes.

17       Q.   If you go to, I guess, it's page iii of the

18  introduction, Roman numerals.  You see that, sir?

19       A.   Yes.

20       Q.   And under the last paragraph it says,

21  "Adoption."

22            Do you see that?

23       A.   Yes.

24       Q.   And first two sentences, "The International

25  Urban-Wildland Interface Code is available for adoption



1   and use by jurisdictions internationally.  Its use

2   within a governmental jurisdiction is intended to be

3   accomplished through adoption by reference in accordance

4   with proceedings establishing the jurisdiction's laws."

5           Do you see that?

6       A.   Yes.

7       Q.   That's a lot of fancy language, but basically

8   your interpretation of this WUI code is that until it's

9   adopted by a jurisdiction's laws, it's not a binding

10  authority; isn't that true?

11          MR. COLE:  Objection.  Calls for a legal

12  conclusion.

13          THE WITNESS:  My understanding from working in

14  a city entity, that we need to adopt the fire code

15  before it becomes a law for our particular city, yes.

16  BY MR. STEELE:

17      Q.   Okay.  And in this particular case, the WUI was

18  not adopted at the time the permits were issued for the

19  Willow Creek Apartments to be built, correct?

20      A.   I don't know that for sure.

21      Q.   You just don't know?

22      A.   No.

23      Q.   And according to the -- what's the next in

24  order?

25          THE REPORTER:  14.



1    A.    Yes, quite awhile ago.

2    Q.    Captain Hicks is the person who primarily

3  investigated and fought the fire at issue in this case,

4  right?

5    A.    Yes.

6    Q.    Captain Hicks did not have any criticisms of

7  the green deck, correct?

8    A.    Correct.

9    Q.    All right.  The response time between when the

10 Willow Creek Volunteer Fire Department was alarmed or

11 notified of the fire and when it got to the scene was

12 about eight minutes; is that a fair statement?

13   A.    Yes.

14   Q.    All right.  The alarm for the fire, though, was

15 made by a driver on Highway 96 driving by the Willow

16 Creek Apartments, correct?

17   A.    Correct.

18   Q.    Highway 96 is how far from the Willow Creek

19 Apartment?

20   A.    Several hundred yards.

21   Q.    At least 400 yards, right, if not --

22   A.    I believe so.

23   Q.    All right.  No tenant -- well, strike that.

24         Ms. Cheatum, we already talked about, did not

25 notify the fire department, correct?



1      A.    Correct.

2      Q.    No other tenant did, as far as you know,

3    correct?

4      A.    Correct.

5      Q.    So it was just pure luck that a driver on

6    Highway 96 saw the fire and called the fire department,

7    right?

8      A.    Yes.

9      Q.    The fact that no tenant called the fire

10   department means that the fire burned longer than it

11   otherwise would have, had a -- someone close by notified

12   the fire department, correct?

13     A.    I guess it's safe to assume that, yes.

14     Q.    Is it more likely than not, that's what

15   occurred?

16     A.    Yes.

17     Q.    Okay.

18     A.    Because somebody did not see it and call in

19   obviously.

20     Q.    All right.  Can you estimate how long the fire

21   burned from inception to first alarm?

22     A.    I believe I stated that in my last deposition,

23   and it could have been as little as three minutes till

24   eight or nine minutes that it could have burned before

25   notification.



1      Q.    Right.  You gave a range, I think, of 12 to 17

2  minutes total for the fire burning before firemen came

3  to the scene?

4      A.    Before they arrived on scene, correct.

5      Q.    12 to 17 minutes, right?

6      A.    Correct.

7      Q.    And once the northwest wall started burning,

8  the vinyl siding, the moisture barrier, and the OSB, was

9  there anything to prevent or stop or impede that flame

10 from going to the attic spaces?

11     A.    Besides the vinyl soffit, no.

12     Q.    And the vinyl soffit is at the top, correct?

13     A.    Correct.

14     Q.    All right.  And the vinyl soffit did not impede

15 the fire into the attic spaces, right?

16     A.    Not much.

17     Q.    Any soffit that was there had vents, openings

18 that would have permitted the fire to go through,

19 correct?

20     A.    Depends on the type of construction.

21     Q.    So you just don't know?

22     A.    Well, in a wildland-Urban-Interface-type

23 construction you'd have to have fireproof vents that

24 don't allow fire through the vent.

25     Q.    And you don't know whether that was required --



```
1                CERTIFICATE OF REPORTER

2          I, MICHELLE L. ARCHULETTA, a Shorthand

3    Reporter, State of California, do hereby certify that

4    the witness in the foregoing deposition was present and

5    by me sworn as a witness in the above-entitled action at

6    the time and place therein specified;

7          That said deposition was taken before me at

8    said time and place, and was taken down in shorthand by

9    me, a Certified Shorthand Reporter of the State of

10   California, and was thereafter transcribed into

11   typewriting, and that the foregoing transcript

12   constitutes a full, true, and correct report of said

13   deposition and of the proceedings that took place;

14         That before completion of the proceedings,

15   the witness has requested review pursuant to Rule

16   30(e)(2).

17         IN WITNESS WHEREOF, I have subscribed my name.

18

19         DATED:  January 18, 2017.

20

21         _____
           MICHELLE L. ARCHULETTA
22         CSR No. 11028

23

24

25
```



```
 1              DEPOSITION ERRATA SHEET

 2

 3   Job No. J0499695

 4   Philadelphia Indemnity Insurance Company

 5   vs.

 6   Danco Builders, et al.

 7

 8          DECLARATION UNDER PENALTY OF PERJURY

 9      I declare under penalty of perjury that I have read

10   the entire transcript of my Deposition taken in the

11   captioned matter or the same has been read to me, and

12   the same is true and accurate, save and except for

13   changes and/or corrections, if any, as indicated by me

14   on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17        Signed on the _____ day of _____,

18   20___.

19

20        _____

21                  LARRY PELTON

22

23

24

25
```



# EXHIBIT 12

October 10, 2016

REBUTTAL TO SEPTEMBER 22, 2016 HUGHES DISCLOSURE

By Matthew Cardle, Registered California Architect

IN THE MATTER OF:

*Philadelphia Indemnity Insurance Company v. Danco Builders*

U.S. District Court, N.D. Cal.,

Case No. 15-cv-03945-WHO

**Introduction:**

Jeff Hughes, a Construction Manager with WEXCO International Corporation submitted his Expert Witness Disclosure in this matter on or about September 22, 2016.  In is disclosure, a number of codes and code supplements are cited which were either not adopted by local and State authorities or were adopted after the drawings were accepted by the Humboldt County Building Department on April 10, 2006 application date for review.  The date on which drawings are accepted for review typically establishes the codes to be enforced through completion of the project.  Though there were emergency amendments issued by the State of California after April 10, 2006 which made some requirements retroactive, the requirements as they relate to this matter were not increased.

The Hughes Disclosure also asserts the Structural Drawings for the Willow Creek Apartments should govern over the Architectural Drawings for non-structural building assemblies.

**Background Information:**

The Hughes Disclosure cites the following published codes and code supplements as they may apply to the decking:

2.1 - 1997 & 2000 Urban-Wildland Interface Codes

2.2 – 2001 California Fire Code

2.3 – 2001 California Building Code

2.5 – 2003 International Urban-Wildlife Interface Code

2.7 – December 2005, Emergency Supplement to the California Building Code (*Chapter 7A Materials and Construction Methods for Exterior Wildfire Exposure*)

2.8 – June 2006, Emergency Supplement to the California Building Code (*Chapter 7A Materials and Construction Methods for Exterior Wildfire Exposure*)

2.9 – July 2006 Emergency Supplement to the California Building Code (*Chapter 7A Materials and Construction Methods for Exterior Wildfire Exposure*) Decking SFM Standard 12-7A-4.

2.10 – 2007 California Building Code

In regard to conflicts between drawings prepared by different design and/or engineering disciplines for the same project, ie Architectural and Structural, materials and assemblies which resist vertical and horizontal (lateral) forces are fixed and described in the Structural Drawings. Materials and assemblies which do not serve to resist these forces are fixed and described in the drawings prepared by other disciplines. Structural drawings will often list and note special conditions like heavy deck toppings to document the engineering criteria used. Where this is done, the structural engineer will commonly refer back to the discipline which may specify the non-structural material or assembly. By noting the material or assembly, the structural engineer is not expected to fully specify or design it. The structural drawings will not automatically govern over the architectural drawings, for example, in the absence of other documentation where a conflict between them may arise.

**Observations:**

The cited Urban Wildlife Interface Codes are not relevant and do not apply. These codes were not adopted by local or State authorities.

The 2007 California Building Code was enforced as of January 1, 2008. This is after the date on which drawings were accepted for review and the issuance of the building permit on November 2, 2006. This code is not relevant in this matter and does not apply.

The 2001 California Building and Fire Codes were adopted by Humboldt County. The December 2005, June 2006, and July 2006 Emergency Supplements were issued by the State of California and adopted by Humboldt County as mandated by the State. The December 2005 Emergency Supplement applied to the design and construction of the Willow Creek Apartments because it was adopted as part of the California Building Code prior to the date on which drawings were accepted for review.

Both the June 2006 and July 2006 Emergency Supplements have requirements retroactive to December 2005, though the requirements do not exceed those put forward in the December 2005 Emergency Supplement as they pertain to this matter.

The December 2005 Emergency Supplement, Section 704, sets requirements for materials, systems, and methods of construction in the State Responsibility Area for roofing (roof coverings, roof valleys, and roof gutters) and attic ventilation (eave or cornice vents). Part 704A.4 is titled *Decking, Floors, and Underfloor Protection* and marked RESERVED. No requirements for decking are set in this emergency supplement.

There is reference to concrete topping slabs at the exterior balconies in the Structural Drawings. The slabs do not resist any vertical or lateral forces. The underlying plywood is called for to provide a substrate for the waterproofing and concrete topping. The deck structure is the same regardless of the decking or topping used as long as it weighs less than and employs similar attachment techniques as the noted concrete topping assembly.

**Conclusion:**

The 2001 California Building Code and the December 2005 Emergency Supplement did not set requirements for the materials, systems, or methods of construction for decking in the State Responsibility Area on the date which drawings were accepted for review by the Humboldt County Building Department. The 2001 California Building Code set the requirements until the issuance of the June 2006 Emergency Supplement.

The General Contractor and the Architect of Record had no obligation to refer to published Urban-Wildlife Interface Codes or the 2007 California Building Code because they were either not or not yet adopted by Humboldt County.

The use of plank decking instead of concrete topping does not present a structural issue because the plank decking does not increase the weight of the deck assembly over the capacities engineered for concrete topping.

Respectfully Submitted,

Matthew Cardle, AIA, CSI

October 10, 2016

# EXHIBIT 13

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

PHILADELPHIA INDEMNITY            )
INSURANCE COMPANY,                )
                                  )
                Plaintiff,        ) Case No.
                                  ) 3:15-cv-03945-WHO
        vs.                       )
                                  )
DANCO BUILDERS, DOES 1 to 10      )
Inclusive,                        )
                                  )
                Defendants.       )
_____  )

EXPERT DEPOSITION OF

VYTENIS BABRAUSKAS, PH.D.

January 03, 2017

9:07 a.m.

1300 Clay Street, Suite 800

Oakland, California

Reported by:  Michelle L. Archuletta, CSR No. 11028



1     A.    No.

2     Q.    And what was your scope of your assignment?

3     A.    It was to answer various fire science-type

4  questions as to behavior of materials of construction

5  practices that are appropriate in high hazard zones and

6  related issues that have to do with fire safety

7  questions.

8     Q.    Are you an origin and cause expert?

9     A.    I -- I'm certainly qualified to opine on the

10 science aspects of these.  I do not do digging of debris

11 in field investigation, so I solely answer questions

12 that are of a scientific nature.  I do not undertake to

13 do investigations for people in the sense of getting out

14 with a team of folks with shovels and processing a fire

15 scene.

16    Q.    Okay.  How about without a team of shovels, but

17 just making a determination what the origin and cause

18 was of the fire?

19    A.    I do do that if it's a question of science

20 being the needed tool for that particular query.

21    Q.    Did you do that in this case?

22    A.    No.

23    Q.    Have you spoken with any other experts in this

24 case retained by Mr. Cole?

25    A.    No.



1   measured information, most likely would be 16 inches on

2   center.

3       Q.   Okay.  So is it your opinion that the cardboard

4   box was somewhere between 0 and 16 inches from the north

5   wall?

6       A.   No.  My opinion is that it was in the next full

7   joist space not counting the joist space that is

8   directly up against the wall, which looks to me like it

9   may have been a little bit short of the spacing that was

10  had by the other joist spaces.

11      Q.   Okay.  Can you give me a rough estimate in feet

12  or inches --

13      A.   Yeah, about a foot away.

14      Q.   When you say "a foot away," and then I'll move

15  on, you're saying that the cardboard box was about a

16  foot away from the north wall, correct?

17      A.   From that exterior wall, yes.

18      Q.   And how long, if you know, did the cardboard

19  box burn?

20      A.   We don't.  We don't have any video or such, to

21  my knowledge, that would -- that would help us to

22  determine that.

23      Q.   Do you have an opinion as to how long the

24  cardboard box burned?  And you're right, we don't have a

25  video of it, but you can, perhaps, offer an opinion if



```
 1                    CERTIFICATE OF REPORTER

 2            I, MICHELLE L. ARCHULETTA, a Shorthand

 3   Reporter, State of California, do hereby certify that

 4   the witness in the foregoing deposition was present and

 5   by me sworn as a witness in the above-entitled action at

 6   the time and place therein specified;

 7            That said deposition was taken before me at

 8   said time and place, and was taken down in shorthand by

 9   me, a Certified Shorthand Reporter of the State of

10   California, and was thereafter transcribed into

11   typewriting, and that the foregoing transcript

12   constitutes a full, true, and correct report of said

13   deposition and of the proceedings that took place;

14            That before completion of the proceedings,

15   the witness has requested review pursuant to Rule

16   30(e)(2).

17            IN WITNESS WHEREOF, I have subscribed my

18   name.

19

20            DATED:   January 9, 2017.

21

22                    Michelle L. Archuletta
                       _____
23                     MICHELLE L. ARCHULETTA
                       CSR No. 11028

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                  DEPOSITION ERRATA SHEET

 2

 3   Job No. J0496144

 4   Philadelphia Indemnity Insurance Company

 5   vs.

 6   Danco Builders, et al.

 7

 8           DECLARATION UNDER PENALTY OF PERJURY

 9       I declare under penalty of perjury that I have read

10   the entire transcript of my Deposition taken in the

11   captioned matter or the same has been read to me, and

12   the same is true and accurate, save and except for

13   changes and/or corrections, if any, as indicated by me

14   on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17       Signed on the _____ day of _____,

18   20___.

19

20           _____

21                VYTENIS BABRAUSKAS, PH.D.

22

23

24

25
```



# EXHIBIT 14



# Fire
# Science and
# Technology Inc.

# REPORT

**To:** Mr. Stephen Cole
The Cole Law Firm
3410 Industrial Blvd., Suite 100
West Sacramento CA 95691

**Prepared by:** Vytenis Babrauskas, Ph.D.

**Date:** 21 October 2016

**Case:** Philadelphia Indemnity Insurance Co. v. Danco Builders

## Circumstances of engagement

I was retained by Mr. Cole on or about 21 August 2016 to review the fire science and performance aspects of this case.

## Qualifications

I have over 40 years' experience in the fire safety science field and have a bachelor's degree in Physics, a Master's degree in Structural Engineering, and a Ph.D. degree in fire protection engineering. In 1975 I was the first U.S. scientist to develop and release a computer model for computing the behavior of room fires. In 2003 I published the first-ever handbook about ignition of fires. In addition, I have published more than 350 papers and reports in the field of fire safety science. I am a member of The Combustion Institute, the International Association for Fire Safety Science, International Code Council, International Association of Arson Investigators, American Society for Testing and Materials, National Fire Protection Association, and Society of Fire Protection Engineers. I am a Fellow in SFPE and have been awarded the Society's highest honor, the Guise Medal. I have been awarded the highest honor by IAFSS, the Howard Emmons Lectureship. I serve as a Principal Member on NFPA's Technical Committee on Fire Investigations, which is the body that develops the standard document describing how fire investigations are to be conducted, NFPA 921. Details of my qualifications are given in the Curriculum Vitae appended to this Report.

---

**926 Hayes Avenue, San Diego CA 92103**
*Phone: (619) 501-7739  Cell: (425) 894-6055   email:vytob@doctorfire.com*

## Material examined

I have examined the following material about this case:

- Willow Creek Fire Department report
- Capt. Cory Hicks deposition
- Dan Johnson deposition
- Chuck Barnhart deposition
- Jeff Hughes expert disclosure
- Larry Pelton expert disclosure
- Bernard Cuzzillo report
- Photographs of the 2013 fire taken by the Willow Creek Fire Department; the independent adjuster; Larry Pelton, and Madsen Kneppers
- 1997 Urban-Wildland Interface Code
- 2003 International Urban-Wildland Interface Code
- Test report: Anamet, Inc.
- Test report: MEI
- Test report: QAI Laboratories
- Test report: Western Fire Center
- Test reports and videos: University of California Forest Products Laboratory
- Willow Creek Apartments construction drawings
- Google Earth map annotated by Jeffrey Hughes, and with unannotated and annotated building plans and specifications.

## Opinions on the case

My opinions in this case are the following. The opinions are based on my education, training and experience, along with a review of the case materials. They are held to a reasonable degree of scientific certainty.

(1) On 16 December 2013, a serious fire occurred at the Willow Creek Apartments, State Route 96, Willow Creek CA. According to the investigation of Larry Pelton, the fire originated from improperly disposed cigarette butts on the outdoor deck of Apt. F. The resident had dumped butts into a paper bag which, in turn, was sitting on a cardboard box. I have also considered the report of Capt. Cory Hicks, wherein he considers the fire cause to have been due to an electrical fault of Christmas lights, however, I consider that Mr. Pelton's determination is the one that is consistent with the burn patterns found at the scene.

(2) The building plans called for the subject deck to be made of either lightweight concrete (sheets S6.2 and S4.2) or Ultra Guard vinyl (sheet A5.1). "Vinyl" refers to polyvinyl chloride (PVC), which is a combustible, plastic material. By contrast, lightweight concrete is a non-combustible building material. It cannot be ignited, does not melt, will not burn, and will not contribute to the spread of a fire. In fact, when used as a floor surfacing, it will protect against effects of fire, since unlike combustible or melting materials, it will not form a hole allowing fire to drop down to a lower level.

# EXHIBIT 15

# BERKELEY RESEARCH COMPANY

PHILADELPHIA INDEMNITY INSURANCE COMPANY,

vs.

DANCO BUILDERS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

CASE NO. 15-cv-03945-WHO

# The Role of Deck Material
# in the Fire at Willow Creek Apartments
# on Dec. 16, 2013 in Willow Creek, CA

EXPERT REPORT

Prepared Sept. 21, 2016

for

D. DAVID STEELE
dsteele@yaronlaw.com
1300 Clay Street, Suite 800
Oakland, California 94612

by Bernard R. Cuzzillo, Ph.D., P.E., C.F.I.

600 ADDISON STREET     BERKELEY     CALIFORNIA     94710-1920     510.868.4350

I. INTRODUCTION

I am Dr. Bernard Cuzzillo. I have a B.S., an M.S. and a Ph.D in mechanical engineering from U.C. Berkeley. I am a licensed mechanical engineer and a Certified Fire Investigator (IAAI). I special-ize in the fire and thermal sciences. I am the founder of the Berkeley Research Company, which focuses on providing forensic consultation in the fire sciences. I have served as an expert in the "origin and cause" of fires in more than 40 trials and more than 70 depositions, since 1989. At-tached as Exhibit 1 is my current CV which includes my fee schedule. Attached as Exhibit 2 is a list of my prior trial or deposition testimony for the past four years.

My assignment in this matter was to determine the origin and cause of the fire that occurred on December 16, 2013 at the Willow Creek Apartments in Willow Creek, California, and whether a composite deck on Apartment F, Building 524 caused or contributed to the fire and its spread. I make this report under Federal Rules of Civil Procedure, Rule 26(a)(2). All of my opinions below are expressed on a more likely than not basis, to a reasonable degree of scientific certainty. For the reasons expressed below, in my opinion, the deck in question and its materials played no substan-tial role in the fire, its cause and origin, or its spread.

II. MATERIALS REVIEWED
1. Numerous photographs of the fire scene from the Willow Creek Volunteer Fire Department and Larry Pelton;
2. Fire Investigation Report, dated 12/16/13, by Captain Cory Hicks;
3. Fire Investigation Report, dated 6/26/08, by Captain Cory Hicks;
4. Decking samples from Willow Creek Apartments, undamaged in the fire;
5. Deposition Transcripts of Cory Hicks, Chuck Barnhart, Larry Pelton & exhibits;
6. Interrogatory Responses of Plaintiff;
7. The following test reports of exemplar deck samples:
   • 1-page report (4/6/14) by Frank Beall, which tested "plastic lumber" supplied by Plaintiff's expert, Larry Pelton plus photographs;
   • 12-page report (7/13/15) by WFCI – The Under Deck and Brand Tests for Trex composite deck samples.
   • 7-page report (7/13/16) by QAI - the standard flame spread and smoke density test, in accordance with ASTM Designation, E84-15b
   • 10-page report (7/27/16) by WFCI – The Under Deck and Brand Tests for the actual deck in accordance with the 2013 California Building Code, Chapter 7A (CSFM 12-7A-4).

III. OPINIONS and CONCLUSIONS

   2008 FIRE
       An earlier fire had occurred on the same Apt. F balcony as the subject fire, and was also started by improperly discarded smoking materials. In that fire, there was damage to the siding, which was repaired for about $13,000; the deck was not damaged, and the fire did not extend into the attic. Figures 17 and 18 show the damage from this fire which appears to have been discovered and extinguished at an earlier stage of development than the 2013 fire. The 2008 fire was discov-ered by a neighbor standing outside the structure; he had time to warn the occupant of Apt. F, throw a garden hose over the second-story railing and go up and extinguish the fire with it. The

fire damage in the 2008 fire is, more likely than not, representative of what the fire damage in the 2013 fire would have looked like if it had been extinguished sooner. In neither case did the deck play a significant role.

### 2013 (Subject) Fire

The subject fire was reported at 11:59 a.m. by a motorist driving on State Highway 96, also designated as the Big Foot Scenic Byway. The point of view of the motorist is about 700 feet away and on the opposite side of the building from the Unit F balcony. To put this distance in perspective, it would take 12 seconds to travel 700 feet at the 40 mph speed limit of Highway 96. This means that the fire attracted a driver's attention and exhibited evidence of an abnormal fire from a long distance, not within the normal driving viewing sight, and during peak sunlight conditions. This level of conspicuity suggests that flames were most likely visible to the driver, as opposed to just smoke which could be from an intentional burn pile or bonfire in this remote area. Thus, this indicates that the fire had entered the attic and had breeched the roof by the time it was reported. This is consistent with Unit F's Nancy Cheatham's statement that she heard pounding on her door, warning of the fire, soon after she had discovered it herself. The fire department arrived 8 minutes later; not a bad response time for a rural, volunteer department. This means that the fire department never had a chance to limit the fire to the deck since it was already in the attic and through the roof at least 8 minutes before they arrived, not to mention the time it would have taken for the necessary pre-suppression procedures including size-up of the critical factors, formulating a risk-management plan, determining overall strategy including deciding whether to operate in offensive or defensive modes, formulation of an incident action plan, establishing personnel accountability, and conducting a primary search for victims[1].

The sequence of ignition and growth of the fire are as follows:

1. The fire initially burned in the smoldering combustion of Ms. Cheatham's cigarette which she discarded initially in an ash tray. She then dumped the contents of the ash tray into a paper bag which became the first (unintentionally ignited) fuel.

2. The second fuel was a cardboard box used as a makeshift table located against the north wall of the balcony.

3. The third fuel was the north wall which consisted of vinyl siding over asphalt-saturated building paper, which, in turn, covers oriented strand board (OSB). Although the vinyl doesn't burn vigorously, it is easily breeched because it is thin and is lapped to shed water; this lapped configuration tends to capture hot gases and flames rising from a fire against a wall. This allows the fire to gain access to the building paper and OSB which does burn intensely. Building paper's technical name is asphalt-saturated kraft paper, and is used as a moisture barrier. It is, as the name suggests, petroleum-soaked paper. As one might imagine, it burns well, particularly on walls—here, the vertical orientation promotes flame spread. OSB's poor fire performance is rooted in its structure which consists of roughly 4" long strips or "strands" of wood veneer that are glued together. The glue fails easily upon exposure to fire and burns along with

---

1    Goodson, C. ed., Essentials of Fire Fighting and Fire Department Operations, 5th ed. 2008, pp 70-71.

the wood which provides a non-melting substrate. These thin strips of glue-coated wood also provide a very high surface-to-volume ratio which results in fast combustion and thus high rates of heat release. Ignition of the north wall was the major accelerating factor in this fire, and is what allowed its flames to reach the ceiling, penetrate it, and enter the attic.

4. Once in the attic, the fire burns well because of two factors: First, the wood fuel is exposed and all attic surfaces are facing other attic surfaces. This provides mutual thermal radiation which promotes fast fire growth. Secondly, with the thin roof deck penetrated, natural convection provides a chimney-like draft of oxygen-laden air to feed the fuel burning in the attic.

5. As the north wall burned and penetrated the attic, OSB chips dropped to the deck and eventually ignited the area that eventually fell through, about 3.6% of the deck. Other points on the deck also were attacked by falling debris and ignited. Mr. Pelton agrees that these other sites were ignited by falling debris, but he doesn't agree that the 3.6% hole was ignited by this same mechanism. In this fire, the composite deck behaved not much differently from a wood deck.

6. As the tests at Western Fire Center demonstrated, once ignited, the deck boards burn and begin dropping burning particles, and ultimately collapse. But this only happened to about 3.6% of the total deck area. More likely than not, this indicates that the deck ignited late in the fire, well after the attic fire was self-sufficient, and fire suppression efforts were already underway. The fallen deck boards caused only superficial damage to the Unit C north wall, as illustrated in Fig. 8. If the deck had ignited early, and had been an important player in the growth of the fire, the entire deck would have become involved in the fire and all of the deck boards would have melted and fallen, leaving the set of joists with no deck boards. The evidence indicates that the small fire involving the deck boards was extinguished late in the fire, and not long after it ignited.

CAPTAIN HICKS' CONCLUSION

Captain Hicks' conclusion was that the heat causing ignition was generated by the Christmas tree lights strung below the Apartment F deck. He surmised that the wires shorted on a supporting nail, igniting the pressure-treated structural wood. I disagree with his hypothesis, and I do agree with Mr. Pelton in this regard. I agree with Mr. Pelton that we see no evidence that the lights were even plugged in. And if they were plugged in, they would not have likely ignited this fire for several reasons. First, the failure of the wire that Capt. Hicks describes would be incapable of delivering significant heat to the hanger nail—which was still present in the wooden beam after the fire—because the electrical circuit is heavily protected by fuses. Second, the fire patterns don't support an origin at this location; in particular, little fuel is consumed there, and there are no patterns of thermal plumes rising from that location. Third, the wooden beam would have burned far more than it did because it would have had to be ignited early and in smolder. And finally, the nail holding Christmas lights would have fallen out because of the degradation to the wood that the necessary heat for ignition would have caused. In addition, there was no smoke staining and hot-layer demarcation line below the deck that would have been present if a fire had burned under it and accumulated there.

DECK MATERIAL

A different deck material, including redwood, Douglas fir, or concrete, with the same debris on it would have burned from the debris vertically, up the north wall towards the attic in the same fashion.

STRUCTURE AND GRAPHICS

The structure is a two-story, wood-framed, six-unit apartment building built around 2006. The interior is protected by a residential fire sprinkler system that does not protect the balconies, patios, and attic space. The attic space is undivided with respect to the attic. Figure 1a shows vicinity maps and an aerial view with annotations showing the compass orientation and origin location. Fig. 1b shows the distance to the passing motorist from the fire. Fig. 1c shows the driver's view of the fire building.

The origin of the fire was on the Unit F balcony as shown in Figure 2 which is a ground-level view of the west elevation, showing that balcony and Unit C's patio below it. This is where the fire was first witnessed by Apartment F tenant, Nancy Cheatham, as reported by Captain Cory Hicks of the Willow Creek Volunteer Fire Department and by Mr. Pelton. Figure 3 is a set of photos, all taken from roughly the same location, showing the burned-open attic at the top of the page and progressing down the page to Unit C's patio at the bottom of the page. It is clear even so far that the origin was not on Unit C's patio as further shown in Figure 4 which shows that most of Unit C's patio is undamaged. Figure 5 is a set of two photos, taken from roughly the same location, showing the underside of Unit F's deck above, and Unit C's patio below. These photos show two things: 1. Most of the composite deck (at least 96%) remains in place and is relatively undamaged. 2. Most of the contents and fascia on Unit C's balcony (below) are undamaged, including low-melting temperature, low thermal inertia items that would have been easily damaged by heat exposure.

Figure 6 begins a series of photos looking at the north wall of Unit C's patio and Unit F's balcony above. The north wall on the lower floor is mostly undamaged. What damage is visible is confined to the upper, northern edge. Figure 7 shows fire debris that has fallen through the hole in the balcony deck above. This debris appears to include some yellow fiberglass insulation that is buried in burned debris. Figure 8 shows Captain Hicks investigating the damage to that wall, pulling off damaged vinyl siding to reveal the undamaged OSB panel behind it.

In Figure 9, the camera moves onto the patio of Unit C to look in an upwards and westerly direction at the fire-damage to the underside of the balcony deck above. The burn patterns show that where fire has penetrated the deck, it did so from above. This photo-illustration also calls out the names of the various structural components.

Figure 10 is a closeup of the origin location hypothesized by Captain Hicks. It shows that there is no focus of damage to the wooden beam at the nail supporting the Christmas light strings. For this hypothesis to be supported, there would need to be such focused damage there.

Figure 10 also shows the broken edges of some green deck boards. The absence of burn damage on these edges indicates that the fracture occurred post-fire. This suggests that the hole was enlarged from its immediate post-fire size. This enlargement could happen during the overhaul stage of fire suppression when fire crews are probing for hidden smolder.

Figure 11 begins a series of views of the damage to the balcony deck and its north wall. The two photos in that figure show undamaged green composite decking where the fire debris has been cleared away. In Figure 12, the viewer has moved onto the deck and is looking down at the origin area that is pointed to by the base of a U-pattern burned into the north wall[2]. This U-pattern is formed by the intersection of the fire plume with the wall; this indicates the origin . The fire has melted away the vinyl siding, burned through the OSB sheathing, began burning the wood studs, and finally burned the paper off of the back of the interior wall's gypsum wallboard. The fire plume penetrated the ceiling above the balcony and entered the attic at this location. Once in the attic, the fire ran toward the ridge and penetrated the roof. Figure 13 is a set two photos showing the U-pattern writ large. Figure 14 shows a larger hole in the decking than was apparent in Figure 12, before debris removal, and again shows the U-pattern burned into the north wall. The photos comprising Figure 15 simply documents that Unit F's balcony was covered above by ceiling and roof. Figure 16 is a photo taken before repairs of the 2008 fire. It shows vinyl siding covering the ceiling of the balcony.

### SUMMARY AND CONCLUSIONS

In summary, the burn patterns comport with the debris on the deck of Apt. F as the origin. Those burn patterns include a U pattern on the north wall of the Apartment F deck. The fire progressed into the undivided attic space through the ceiling that covers the deck. There is no other area with significant fire damage below the attic.

The first fuel ignited was contents on the deck. Aside from isolated holes caused by flaming debris falling on the deck from above, the deck was largely protected from fire damage by these contents. No significant fire burned under the deck as evidenced by:

- the lack of significant burn damage—to contents or structure—on the patio of Apartment C which is directly below the deck of Apartment F,
- the lack of any smoke layer demarcation on the Unit C patio walls, and by
- the lack of soot deposits on the underside of most of the deck.

The largest hole in the deck (only 3.6%) was more likely than not created late in the fire and more likely than not enlarged post-fire. If it had been created earlier, it would have caused more damage to the north wall at the floor level of the patio below. This wall received only superficial damage at patio floor level below. The fire test results show that flaming deck material will readily extend the fire to the level below.

Moreover, the fire test results (*10-page report cited on page 2*) on samples of the subject decking show that it collapses and drops burning material when exposed to a severe fire. In contrast, the

---

2    NFPA 921-2014, 6.3.7.4 U-Shaped Patterns

subject decking survived the fire with little damage, indicating that it was never a significant fuel in the subject fire.

In other words, whatever its fire-performance characteristics, the deck was not put to much of a test by the subject fire, because at least 96% sustained little or no damage.

1

<u>**PROOF OF SERVICE**</u>

2

I am over 18 years of age and not a party to the within action. I am employed in the County of Alameda; my business address is Yaron & Associates, 1300 Clay Street, Suite 800, Oakland, California, 94612.

3

4

On **April 14, 2017,** I served the within:

5

**DECLARATION OF D. DAVID STEELE IN SUPPORT OF DEFENDANT DANCO BUILDERS' MOTIONS IN LIMINE (Nos. 1-6)**

6

7

as addressed below, by causing a true copy thereof to be distributed as follows:

8

| Stephen N. Cole, Esq. | Thomas G. Beatty, Esq. |
|---|---|
| THE COLE LAW FIRM | MCNAMARA, NEY, BEATTY, |
| 3410 Industrial Blvd., Suite 100 | SLATTERY, BORGES & AMBACHER |
| West Sacramento, CA 95691 | LLP |
| Tel: (916) 376-0486 | 1211 Newell Avenue |
| Fax: (916) 376-0478 | Walnut Creek, CA 94596-5238 |
| scole@colenetlaw.com | Tel: (925) 939-5330 |
| | Fax: (925) 939-0203 |
| | thomas.beatty@mcnamaralaw.com |

9

10

11

12

13

14

( )  **VIA U.S. MAIL:**  I am "readily familiar" with the firms practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

15

16

17

( )  **VIA HAND-DELIVERY:**  I caused such envelope, to be hand delivered to the stated parties.

18

( )  **VIA FAX:**  I caused such documents to be transmitted via fax to the stated parties at their respective facsimile numbers.

19

20

( )  **VIA EXPRESS CARRIER:**  I caused such documents to be collected by an agent from to be delivered to the offices of the stated parties.

21

( X )  **VIA E-MAIL:**  Pursuant to agreement, I caused such document to be sent via email to the offices of the addressees so designated.

22

23

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on **April 14, 2017,** at Oakland, California

24

25

26

_____
                **Kelly Forst**

27

28